PD-1636-14
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 2/2/2015 11:48:22 AM
Accepted 2/4/2015 10:50:53 AM
ABEL ACOSTA
CLERK

No. PD-1636-14

# In the
# Court of Criminal Appeals of Texas

WALTER DEMOND,
*Petitioner,*

v.

THE STATE OF TEXAS,
*Respondent.*

On Petition for Discretionary Review from the
Third Court of Appeals at Austin, Texas

## STATE'S CROSS-PETITION FOR DISCRETIONARY REVIEW

KEN PAXTON
Attorney General of Texas

CHARLES E. ROY
First Assistant Attorney
General

SCOTT A. KELLER
Solicitor General

DUSTIN HOWELL
Assistant Solicitor General
State Bar No. 24050169

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-0826
Fax: (512) 474-2697
*dustin.howell@texasattorneygeneral.gov*

COUNSEL FOR THE STATE

FILED IN
COURT OF CRIMINAL APPEALS

February 4, 2015

ABEL ACOSTA, CLERK

## IDENTITY OF JUDGES, PARTIES, AND COUNSEL

### *Trial Court Judges*

The Honorable Dan Mills

The Honorable Bert Richardson (by assignment)[1]

424th District Court, Blanco County

### *Counsel for Petitioner Walter Demond*

*Counsel in This Court*

James C. Ho

Kyle Hawkins

Prerak Shah

GIBSON, DUNN & CRUTCHER LLP

2100 McKinney Avenue

Suite 1100

Dallas, Texas  75201

*jho@gibsondunn.com*

*Counsel in the Court of Appeals*

| | |
|---|---|
| James C. Ho | Daniel L. Geyser |
| GIBSON, DUNN & CRUTCHER LLP | MCKOOL SMITH |
| 2100 McKinney Avenue | 300 Crescent Court |
| Suite 1100 | Suite 1500 |
| Dallas, Texas  75201 | Dallas, TX  75201 |
| *jho@gibsondunn.com* | *dgeyser@mckoolsmith.com* |

*Trial and Additional Appellate Counsel*

| | |
|---|---|
| E.G. (Gerry) Morris | Warren L. "Rip" Collins |
| LAW OFFICE OF E.G. MORRIS | MINTON, BURTON, BASSETT & |
| 608 W. 12th Street, Suite B |   COLLINS |
| Austin, Texas  78701 | 1100 Guadalupe Street |
| *egm@egmlaw.com* | Austin, Texas  78701 |
| | *rcollins@mbfc.com* |

---

[1] Judge Richardson ruled on the disqualification and recusal issues.

***Counsel for the State***

*Counsel in This Court and the Court of Appeals*
Dustin M. Howell
Assistant Solicitor General
OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
*dustin.howell@texasattorneygeneral.gov*

*Trial Counsel*
Harry E. White
Tom Cloudt
Assistant Attorneys General
OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC 048)
Austin, Texas 78711-2548
*harry.white@texasattorneygeneral.gov*

# TABLE OF CONTENTS

Identity of Judges, Parties, and Counsel.....................................................i

Index of Authorities..........................................................................iv

Statement of the Case ........................................................................vi

Statement of Procedural History ............................................................vi

Statement Regarding Oral Argument .......................................................vi

Cross-Ground for Review ....................................................................vii

Argument.........................................................................................1

    I.    The Court of Appeals Placed Too High a Burden on the State to Prove Theft by Deception. .......................................2

    II.    The Court of Appeals Ignored the Law of Parties as an Alternative Means of Upholding Demond's Theft Conviction.............................................................8

Prayer ...........................................................................................13

Certificate of Service ........................................................................14

Certificate of Compliance...................................................................14

Appendix
    *Demond v. State*, No. 03-11-00553-CR, 2014 WL 6612510 (Tex. App.—Austin Nov. 21, 2014, pets. filed).

# INDEX OF AUTHORITIES

**Cases**

*Clayton v. State,*
    235 S.W.3d 772 (Tex. Crim. App. 2007) ........................................ 2

*Daugherty v. State,*
    387 S.W.3d 654 (Tex. Crim. App. 2013) ........................................ 5

*Demond v. State,* No. 03-11-00553-CR,
    2014 WL 6612510 (Tex. App.—Austin Nov. 21, 2014,
    pets. filed) .......................................................................... *passim*

*Fuelberg v. State,*
    447 S.W.3d 304 (Tex. App.—Austin 2014, pet. filed) .................... 10

*Hooper v. State,*
    214 S.W.3d 9 (Tex. Crim. App. 2007) .......................................... 2

*King v. State,*
    17 S.W.3d 7 (Tex. App.—Houston [14th Dist.] 2000,
    pet. ref'd) ........................................................................ 9-10

*Matchett v. State,*
    941 S.W.2d 922 (Tex. Crim. App. 1996) (en banc) ........................ 2

*Ragan v. State,*
    No. 14-99-00020-CR, 2000 WL 1676060
    (Tex. App.—Houston [14th Dist.] Nov. 9, 2000,
    pet. ref'd) (not designated for publication) ..................................... 9

*Roberts v. State,*
    319 S.W.3d 37 (Tex. App.—San Antonio 2010,
    pet. ref'd) ............................................................................ 9

*Swope v. State,*
    805 S.W.2d 442 (Tex. Crim. App. 1991) ....................................... 9

## Statutes and Rules

TEX. PENAL CODE § 7.01(a) ....................................................................9

TEX. PENAL CODE § 7.02(a)(2) ...........................................................9, 11

TEX. PENAL CODE § 7.03(2) .................................................................10

TEX. PENAL CODE § 31.01 ............................................................4, 10-11

TEX. PENAL CODE § 31.01(1)(A) ...........................................................3

TEX. PENAL CODE § 31.01(1)(B) ...........................................................3

TEX. PENAL CODE § 31.01(1)(C) ...........................................................3

TEX. PENAL CODE § 31.01(2)(A) ...........................................................4

TEX. PENAL CODE § 31.01(3)(A) ...........................................................3

TEX. PENAL CODE § 31.01(4) .................................................................3

TEX. PENAL CODE § 31.03(a) .................................................................2

TEX. PENAL CODE § 31.03(b)(1) ............................................................2

TEX. R. APP. P. 9.4(i)(1) ......................................................................14

TEX. R. APP. P. 9.4(i)(2) ......................................................................14

TEX. R. APP. P. 66.3(a) .........................................................................1

TEX. R. APP. P. 66.3(c) .........................................................................1

## STATEMENT OF THE CASE

This petition arises from Petitioner Walter Demond's convictions for misapplication of fiduciary property, theft, and money laundering in connection with his role as an attorney for the Pedernales Electric Cooperative ("PEC"). 2.CR.761-66; 19.RR.4-5.[2]

## STATEMENT OF PROCEDURAL HISTORY

The court of appeals' opinion issued on November 21, 2014. *Demond v. State*, No. 03-11-00553-CR, 2014 WL 6612510 (Tex. App.—Austin Nov. 21, 2014, pets. filed) (Field, J., joined by Jones, C.J., and Pemberton, J.). The court affirmed the trial court's judgment in part, reversed and vacated in part, and modified the conditions of Petitioner's community supervision. *Id.* at *1. Neither Petitioner nor the State filed a motion for rehearing.

## STATEMENT REGARDING ORAL ARGUMENT

The State does not believe that oral argument is necessary for any of the issues in this case. If, however, the Court chooses to hear oral argument, the State requests the opportunity to participate.

---

[2] "CR" refers to the clerk's record, and "RR" to the reporter's record.

## CROSS-GROUND FOR REVIEW

The State asserts a single cross-ground for review:

1.    The court of appeals erred when it concluded that Petitioner's theft-by-deception conviction rested on legally insufficient evidence. The court's reasoning—that only explicit testimony indicating that the victim organization's board members would not have approved of certain hires had they known of Petitioner's and his accomplice's fraudulent scheme, *Demond*, 2014 WL 6612510, at *12-14—misstated the State's burden and ignored the law of parties.

To the Honorable Court of Criminal Appeals of Texas:

The court of appeals correctly affirmed Petitioner's convictions for misapplication of fiduciary property and money laundering. His petition for discretionary review should therefore be denied. The court below, however, erred in overturning Petitioner's theft-by-deception conviction, holding the State to a burden that has no basis in this Court's interpretation of the elements of the crime, and ignoring Petitioner's responsibility, under the law of parties, for his accomplice's theft. *See* TEX. R. APP. P. 66.3(a), (c) (discretionary review in this Court appropriate when the decision of the court of appeals conflicts with decisions of this Court or other courts of appeal). The Court should grant the State's cross-petition and reverse the erroneous portion of the court of appeals' judgment.

## ARGUMENT

Petitioner challenged the legal sufficiency of his convictions on appeal. *See Demond*, 2014 WL 6612510, at *4. "[I]n analyzing legal sufficiency, [courts] 'determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict.'"

*Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) (quoting *Hooper v. State*, 214 S.W.3d 9, 16-17 (Tex. Crim. App. 2007)). Rather than apply this settled standard of review to Petitioner's challenge to his theft conviction, the court of appeals usurped the role of the jury, reweighing the evidence and refusing to acknowledge key facts supporting the conviction. *See Demond*, 2014 WL 6612510, at *12-14. "[A] reviewing court does not sit as a thirteenth juror reweighing the credibility or weight of evidence, but asks only whether the evidence exists to support the jury's finding." *Matchett v. State*, 941 S.W.2d 922, 936 (Tex. Crim. App. 1996) (en banc). The court of appeals did just that when it overturned Petitioner's theft conviction. If left to stand, the decision will make it more difficult for prosecutors to rely on circumstantial evidence or the law of parties to establish theft by deception.

## I. THE COURT OF APPEALS PLACED TOO HIGH A BURDEN ON THE STATE TO PROVE THEFT BY DECEPTION.

An individual commits theft "if he unlawfully appropriates property with intent to deprive the owner of property." TEX. PENAL CODE § 31.03(a). "Appropriation of property is unlawful if . . . it is without the owner's effective consent." *Id.* § 31.03(b)(1). "Appropriate"

2

means "to bring about a transfer or purported transfer of title to or other nonpossessory interest in property, whether to the actor or another; . . . or to acquire or otherwise exercise control over property other than real property." *Id.* § 31.01(4). The statute defines "effective consent" as "consent by a person legally authorized to act for the owner" and notes that "[c]onsent is not effective if . . . induced by deception or coercion." *Id.* § 31.01(3)(A). The statute defines "deception" as, among other things, "creating or confirming by words or conduct a false impression of law or fact that is likely to affect the judgment of another in the transaction, and that the actor does not believe to be true," *id.* § 31.01(1)(A), "failing to correct a false impression of law or fact that is likely to affect the judgment of another in the transaction, that the actor previously created or confirmed by words or conduct, and that the actor does not now believe to be true," *id.* § 31.01(1)(B), or "preventing another from acquiring information likely to affect his judgment in the transaction," *id.* § 31.01(1)(C).

Petitioner, an attorney for PEC, carried out a years-long scheme in which he and Bennie Fuelberg (PEC's general manager) funneled PEC money through Petitioner's law firm (Clark Thomas) to Bennie's

3

brother Curtis and to Bill Price, the son of a prominent PEC board member. *E.g.*, 9.RR.53; 10.RR.123-24; 13.RR.49, 73-74. Petitioner was able to successfully perpetrate this scheme against his client for years because of the misleading bills he sent to PEC from his firm—which prevented anyone, other than Bennie Fuelberg, from discovering the sham arrangements with Curtis and Price. *E.g.*, 9.RR.163; 11.RR.197; 16.RR.155. Indeed, the court of appeals acknowledged that the jury heard "evidence that his deceptive billing practices induced the PEC to unknowingly reimburse Clark Thomas for Curtis's salary and Price's retainer." *Demond*, 2014 WWL 6612510, at *13.

In so doing, Petitioner "creat[ed] . . . a false impression of . . . fact," "fail[ed] to correct a false impression of . . . fact," and "prevent[ed] [the PEC board] from acquiring information," all of which was "likely to affect the judgment of [the PEC board]," and all of which Appellant knew to be dishonest. *See* TEX. PENAL CODE § 31.01. And because there was also evidence that PEC did not receive value from the sham hires of Curtis and Price, *e.g.*, 10.RR.106; 11.RR.37, 104, 117; 12.RR.48; 16.RR.118, it was reasonable for the jury to conclude that PEC was "deprived" of its property. *See id.* § 31.01(2)(A) (defining "deprive" as

4

"dispos[ing] of property in a manner that makes recovery of the property by the owner unlikely"). Viewing this evidence in a light most favorable to the verdict, the court of appeals should have affirmed Petitioner's theft conviction.

But the court of appeals reversed the conviction, noting the lack of "direct testimony that if Clark Thomas's bills had accurately reflected that payments were being made to Curtis and Price, the PEC would not have consented to reimburse Clark Thomas for those payments." *Demond*, 2014 WL 6612510, at *13. The court went on to frame the question presented as whether "there [was] sufficient circumstantial evidence from which the jury could infer that the PEC's decision to reimburse Clark Thomas for Curtis's and Price's income was materially affected by Demond's deceptive billing." *Id.* (citing *Daugherty v. State*, 387 S.W.3d 654, 659 n.18 (Tex. Crim. App. 2013)).

The court of appeals' analysis, however, demonstrated an unwillingness to consider the evidence supporting the jury's verdict. For example, the court minimized testimony from PEC's assistant general manager that he would have been concerned if he had known of the billing arrangement for Curtis and Price and that he would have

reported them to Fuelberg and possibly to the board itself, as well as his testimony that if employees had known of these sham arrangements, "'all hell would have broken loose.'" *Id.* (discussing testimony of Will Dahmann, 11.RR.35, 60). The court also diminished the importance of the testimony of multiple directors that they would have wanted to know about these arrangements in deciding whether to approve them. *Id.* (discussing testimony of E.B. Price, 10.RR.133-34; O.C. Harmon, 10.RR.194-96; Edwin Smith, 12.RR.14-15; Vi Cloud, 13.RR.41-42; R.B. Felps, 13.RR.191).[3] Moreover, the court ignored testimony, for example, that, in an effort to disguise them from the board, the arrangements for Curtis and Price were structured unlike any other lobbying or attorney-retainer arrangement PEC held. *See, e.g.*, 9.RR.155, 186, 188, 231; 10.RR.23; 15.RR.39-40; 17.RR.35, 52-53 (bills were invoiced in advance and prepaid into a Clark Thomas trust account); 10.RR.109, 111, 133-34; 11.RR.263-64; 14.RR.68 (Curtis was the only lobbyist "hired" through a law firm); 11.RR.63-66 (Price was the only attorney whose payments were not disclosed to the board); 13.RR.158 (Curtis was the

---

[3] The opinion references three directors who testified that they would have wanted to know about the arrangements, though, as reflected above, there were at least five who indicated they would have wanted to know.

only PEC lobbyist who did not register with the Texas Ethics Commission).

Had the court below viewed this evidence in a light most favorable to the verdict, it would have upheld Petitioner's theft-by-deception conviction. The evidence was more than enough to conclude that Petitioner's deceptive billing practices were "likely to affect" PEC's decision to part with its property to pay for Curtis's and Price's arrangements. By covering up these arrangements, Demond prevented the board from having any knowledge of their existence, and thus he cannot correctly assert, and the court of appeals was incorrect to conclude, that his deception did not materially affect their decision-making.

Although the court of appeals acknowledged that theft by deception can be proven with circumstantial evidence, the court's reasoning demonstrates that it would affirm the conviction only if it were supported by direct testimony that the board definitely would not have agreed to the arrangements had it known of them. *See, e.g.*, *Demond*, 2014 WL 6612510, at *13-14 (holding evidence legally insufficient where "none of the directors testified that the board would

7

have stepped in and blocked these payments," "none of the directors testified [that] they would have recommended that the PEC's nepotism policy be modified," and "no witness testified that . . . [the board of directors or PEC accounting department] would have considered terminating Fuelberg's employment or reining in his authority" had they known of the arrangements).  This sets an impossibly high bar for prosecutors to meet.  The Court should grant the State's cross-petition for review and reverse the erroneous portion of the court of appeals' judgment.

II.  THE COURT OF APPEALS IGNORED THE LAW OF PARTIES AS AN ALTERNATIVE MEANS OF UPHOLDING DEMOND'S THEFT CONVICTION.

In its discussion of Petitioner's misapplication-of-fiduciary-property conviction, the court of appeals correctly recognized that Petitioner was guilty both for his own criminal conduct and as a party to Bennie Fuelberg's criminal conduct.  *Id.* at \*12.  Yet the court, for reasons unexplained, explicitly declined to apply the law of parties when reviewing Petitioner's theft conviction.  *See id.* at \*6 ("Our analysis will focus on whether the evidence is sufficient to prove that Demond is liable as a party to Fuelberg's misapplication of fiduciary

8

property. However, we will primarily consider whether Demond is guilty of theft by deception based on his own conduct."). The court ignored this basis for Petitioner's conviction despite the fact that the jury was instructed to consider the law of parties in reaching its verdict for all three crimes. 2.CR.723-24 (misapplication), 727 (theft), 731 (money laundering).

"A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both." TEX. PENAL CODE § 7.01(a). "A person is criminally responsible for an offense committed by the conduct of another if . . . acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense." *Id.* § 7.02(a)(2). Multiple courts, including this one, have upheld theft-by-deception convictions under the law of parties. *See, e.g.*, *Swope v. State*, 805 S.W.2d 442, 445 (Tex. Crim. App. 1991); *Roberts v. State*, 319 S.W.3d 37, 50 (Tex. App.—San Antonio 2010, pet. ref'd); *Ragan v. State*, No. 14-99-00020-CR, 2000 WL 1676060, at *4-5 (Tex. App.—Houston [14th Dist.] Nov. 9, 2000, pet. ref'd) (not designated for publication); *King v.*

9

*State*, 17 S.W.3d 7, 14-15 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd).

Petitioner was a party to Bennie Fuelberg's theft.[4]   Fuelberg successfully induced the PEC to part with the funds for the Curtis and Price arrangements by, among other things, instructing Petitioner to list Curtis's services anonymously on Clark Thomas's bills as "legal services rendered in connection with regulatory and legislative services," though Curtis was not an attorney, 16.RR.155; instructing Petitioner to inflate PEC's general monthly bill without listing Curtis's or Price's arrangements, 9.RR.123-27, 163, 235-39; and assuming sole responsibility for approving Clark Thomas's bills after Luis Garcia, PEC's human resources manager,[5] questioned several entries, 10.RR.37, 256-57.  In these ways, Fuelberg prevented the PEC board from acquiring information that was "likely to affect [its] judgment," and he was therefore guilty of theft by deception.  *See* TEX. PENAL CODE

---

[4] Fuelberg was convicted of theft (along with misapplication of fiduciary property and money laundering) for his role in this scheme, and the Third Court of Appeals recently affirmed the conviction.  *See Fuelberg v. State*, 447 S.W.3d 304, 319 (Tex. App.—Austin 2014, pet. filed).  Fuelberg's conviction, however, is not necessary to establish Petitioner's liability under the law of parties.  TEX. PENAL CODE § 7.03(2).

[5] Garcia was later made PEC's general counsel.  10.RR.235; 20.RR.42.

§ 31.01. And because Petitioner helped Fuelberg carry out this scheme by utilizing falsified bills issued from his law firm, Petitioner "encourage[ed]" and "aid[ed]" Fuelberg in the scheme, and thus was liable as a party to Fuelberg's theft. *Id.* § 7.02(a)(2).

As it did in assessing Petitioner's guilt as a principal actor, the court of appeals noted that there was no direct testimony that the PEC board would have reined in Fuelberg's authority had it known about the Curtis and Price arrangements and that, therefore, the jury would have to "make some inferences about the PEC board's potential reaction to the deception" to hold Petitioner liable as a party to Fuelberg's theft. *Demond*, 2014 WL 6612510, at *12. After making this observation, however, the court of appeals turned to Petitioner's guilt as a principal actor and never addressed the permissible inferences arising from the evidence the jury heard. *See id.* at *13. The court concluded by noting that "the evidence is insufficient to support a finding that either Demond's *or Fuelberg's* deception induced the PEC to make payments it otherwise would not have made." *Id.* at *14 (emphasis added). Significantly, however, the court of appeals never actually discussed

11

any of Fuelberg's deceptions that gave rise to Demond's liability under the law of parties. *Id.* at \*13.

As with its reformulation of the burden to prove theft by deception, the court of appeals' failure to fully consider the law of parties as an alternative basis for affirming Petitioner's theft conviction conflicts with the decisions of this Court and of multiple courts of appeals that have upheld theft-by-deception convictions on that basis. The Court should reverse the erroneous portion of the court of appeals' judgment.

## PRAYER

The Court should deny Petitioner's petition for discretionary review, grant the State's cross-petition, reverse the portion of the court of appeals' judgment reversing Petitioner's theft conviction, and render judgment affirming the trial court's judgment in whole.

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

CHARLES E. ROY
First Assistant Attorney General

SCOTT A. KELLER
Solicitor General


/s/ Dustin M. Howell
DUSTIN M. HOWELL
Assistant Solicitor General
State Bar No. 24050169

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-0826
Fax: (512) 474-2697
*dustin.howell@texasattorneygeneral.gov*

COUNSEL FOR THE STATE

13

**CERTIFICATE OF SERVICE**

On February 2, 2015, this Cross-Petition for Discretionary Review was served via File & Serve Xpress on:

James C. Ho
GIBSON, DUNN & CRUTCHER
   LLP
2100 McKinney Avenue
Suite 1100
Dallas, Texas 75201
*jho@gibsondunn.com*

Lisa C. McMinn
STATE PROSECUTING ATTORNEY
P.O. Box 13406
Austin, Texas 78711-3046
*lisa.mcminn@spa.texas.gov*

<u>/s/ Dustin M. Howell</u>
DUSTIN M. HOWELL

**CERTIFICATE OF COMPLIANCE**

In compliance with Texas Rule of Appellate Procedure 9.4(i)(2), this brief contains 2,322 words, excluding the portions of the brief exempted by Rule 9.4(i)(1).

<u>/s/ Dustin M. Howell</u>
DUSTIN M. HOWELL

# Appendix



--- S.W.3d ----, 2014 WL 6612510 (Tex.App.-Austin)
**(Cite as: 2014 WL 6612510 (Tex.App.-Austin))**


**H**

Only the Westlaw citation is currently available.OPINION


Court of Appeals of Texas,
Austin.
Walter Demond, Appellant
v.
The State of Texas, Appellee


NO. 03–11–00553–CR
Filed: November 21, 2014


**Background:** Defendant was convicted in the 424th Judicial District Court, Blanco County, Daniel H. Mills, J., of misapplication of fiduciary property, theft by deception, and money laundering. Defendant appealed.


**Holdings:** The Court of Appeals, Scott K. Field, J., held that:
(1) indictment on charge for misapplication of fiduciary property did not have to allege liability as party in order to support conviction for same as party;
(2) evidence supported conviction for misapplication of fiduciary property;
(3) finding that consultant and attorney hired by defendant's law firm provided some benefit to client did not preclude charge for misapplication of fiduciary property;
(4) evidence was insufficient to support conviction for theft by deception;
(5) evidence supported conviction for money laundering;
(6) variance between evidence presented and indictment on charge for misapplication of fiduciary property involved non-statutory allegations that were immaterial to determination of sufficiency of evidence to support charge for money laundering;
(7) trial court had authority to order that defendant serve consecutive periods of jail time, as condition of community supervision for misapplication of fiduciary property and money laundering, for total of 320 days; and
(8) trial court's determination that juror had become "disabled," as basis for removal, was not abuse of discretion.


Affirmed in part; reversed and vacated in part, and modified in part.


West Headnotes


**[1] Indictment And Information 210 ⚷83**


210 Indictment and Information
    210V Requisites and Sufficiency of Accusation


© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- S.W.3d ----, 2014 WL 6612510 (Tex.App.-Austin)
**(Cite as: 2014 WL 6612510 (Tex.App.-Austin))**

210k83 k. Principals in second degree; aiders and abettors. Most Cited Cases

Indictment on charge for misapplication of fiduciary property did not have to allege culpability under law of parties in order for defendant's conviction to be based on evidence showing that he encouraged, directed, aided, or attempted to aid codefendant's misapplication of that property. Tex. Penal Code Ann. §§ 7.01, 7.02, 32.45.

**[2] Indictment And Information 210 ⚷171**

210 Indictment and Information
    210XII Issues, Proof, and Variance
        210k170 Variance Between Allegations and Proof
            210k171 k. In general. Most Cited Cases

A "variance" occurs whenever there is a discrepancy between the allegations in the indictment and the proof offered at trial.

**[3] Criminal Law 110 ⚷1167(1)**

110 Criminal Law
    110XXIV Review
        110XXIV(Q) Harmless and Reversible Error
            110k1167 Rulings as to Indictment or Pleas
                110k1167(1) k. Indictment or information in general. Most Cited Cases

**Indictment And Information 210 ⚷171**

210 Indictment and Information
    210XII Issues, Proof, and Variance
        210k170 Variance Between Allegations and Proof
            210k171 k. In general. Most Cited Cases

A variance between the allegations of an indictment and the evidence offered at trial is "material," and thus reversible error, only if it fails to give the defendant sufficient notice of the offense alleged or would not bar a second prosecution for the same crime.

**[4] Indictment And Information 210 ⚷83**

210 Indictment and Information
    210V Requisites and Sufficiency of Accusation
        210k83 k. Principals in second degree; aiders and abettors. Most Cited Cases

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- S.W.3d ----, 2014 WL 6612510 (Tex.App.-Austin)
**(Cite as: 2014 WL 6612510 (Tex.App.-Austin))**

An indictment need not include notice that the State will attempt to prove its case under the law of parties, and therefore, an accused may be convicted as a party to the offense even if the indictment does not explicitly charge him as a party.

**[5] Criminal Law 110 🔑80**

110 Criminal Law
    110VII Parties to Offenses
        110k79 Prosecution and Punishment of Principals and Accessories
            110k80 k. In general. Most Cited Cases

Circumstantial evidence may be used to prove the defendant is a party to an offense, and a factfinder may look to events occurring before, during, and after the commission of the offense that show an understanding or common design to do the prohibited act.

**[6] Embezzlement 146 🔑44(6)**

146 Embezzlement
    146k44 Weight and Sufficiency of Evidence
        146k44(6) k. Conversion or appropriation of property. Most Cited Cases

Evidence was sufficient to show that general manager for defendant's client knew that his brother and other consultant would provide little or no benefit to client, and therefore, that general manager lacked authority to order defendant to make monthly payments and retainer fees to brother and other consultant, and then be reimbursed by client, contrary to agreement under which general manager held client's property, as required to support defendant's conviction for misapplication of fiduciary property, on theory of party liability. Tex. Penal Code Ann. § 32.45(a)(2)(A).

**[7] Embezzlement 146 🔑11(1)**

146 Embezzlement
    146k3 Elements of Offenses
        146k11 Conversion or Appropriation of Property
            146k11(1) k. In general. Most Cited Cases

Finding that lobbyist consultant and attorney, who were hired and retained by defendant's law firm at direction of general manager of defendant's client, provided some benefit to client did not preclude jury determination that defendant, at direction of general manager, used client funds to pay monthly salary and retainer fees in excess of value of services, for purposes of showing that defendant intentionally misapplied or stole client's money, as required to support charge for misapplication of fiduciary property. Tex. Penal Code Ann. § 32.45(b).

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- S.W.3d ----, 2014 WL 6612510 (Tex.App.-Austin)
**(Cite as: 2014 WL 6612510 (Tex.App.-Austin))**

**[8] Embezzlement 146 ⚷44(6)**

146 Embezzlement
   146k44 Weight and Sufficiency of Evidence
      146k44(6) k. Conversion or appropriation of property. Most Cited Cases

    Evidence was sufficient to show that defendant, who was law partner for firm that represented client, never intended for client to receive any benefit from client's payment of attorney's $2,000 monthly retainer fee, as required to support conviction for misapplication of fiduciary property; attorney testified that he never knew client was paying his retainer, he was never advised that he would be performing work for client, and he was never given work to perform for client, and defendant admitted that during years that attorney was on retainer, defendant's firm performed work for client that attorney was qualified to handle and work would have cost less than monthly retainer paid to attorney, meaning that attorney could have performed work at no additional cost to client. Tex. Penal Code Ann. § 32.45.

**[9] Embezzlement 146 ⚷44(6)**

146 Embezzlement
   146k44 Weight and Sufficiency of Evidence
      146k44(6) k. Conversion or appropriation of property. Most Cited Cases

    Evidence was sufficient to show that defendant, who was partner of law firm that represented client, did not intend for client to receive any benefit from hiring, at direction of client's general manager, of consulting lobbyist, whose salary was paid mostly from client funds, as required to support conviction, based on party theory of liability, for misapplication of fiduciary property; consultant, who was not registered lobbyist, did not participate in client's negotiations concerning deregulation 1997 and 1999 legislative sessions, consultant was paid same salary regardless, and defendant and general manager went to great lengths to conceal consultant's employment from client. Tex. Penal Code Ann. § 32.45; Tex. Gov't Code Ann. § 305.003(b).

**[10] False Pretenses 170 ⚷9**

170 False Pretenses
   170k3 Elements of Offenses
      170k9 k. Reliance on pretense and inducement to act. Most Cited Cases

    The victim's reliance on a defendant's deceptive act in giving the defendant consent to exercise control over the victim's property, for the purpose of a charge for theft by deception, need not be the sole, or even controlling, reason why the victim decided to provide his consent, but it must be a substantial or material factor in the decision-making process. Tex. Penal Code Ann. § 31.01(3)(A).

**[11] False Pretenses 170 ⚷49(1)**

--- S.W.3d ----, 2014 WL 6612510 (Tex.App.-Austin)
**(Cite as: 2014 WL 6612510 (Tex.App.-Austin))**

170 False Pretenses
    170k49 Weight and Sufficiency of Evidence
        170k49(1) k. In general. Most Cited Cases

    Evidence supported finding that defendant, who was partner of law firm that represented client, deceived client with respect to hiring of lobbyist consultant and attorney, and payment of consultant's salary and attorney's monthly retainer fee, as required to support charge for theft by deception; defendant testified that client's general manager instructed him to hire and retain consultant and attorney, and then have client reimburse law firm for payment of salary/retainer fee, and that general manager instructed him to change law firm's bills to client so that client would not be able to determine that it was indirectly paying consultant and attorney. Tex. Penal Code Ann. § 31.01(1)(A), (C).

**[12] False Pretenses 170 &#128273;9**

170 False Pretenses
    170k3 Elements of Offenses
        170k9 k. Reliance on pretense and inducement to act. Most Cited Cases

    Evidence was insufficient to show that client represented by law firm for which defendant was partner would have terminated its general manager's employment or would have refused to consent to reimbursing law firm for large percentage salary and retainer fees of consultant and attorney hired and retained by firm, had it known about hiring of consultant and retention of attorney, as required to support defendant's conviction for theft by deception; although client's board members testified that they would like to have known that client was indirectly paying consultant's salary and attorney's retainer, none of them testified that board would have stepped in and blocked these payments, and there was no witness testimony that, had either client's accounting department or board of directors known about these payments, they would have considered terminating employment of general manager, who directed defendant to hire consultant and attorney and to seek reimbursement of salary/retainer fee from client, or would have reined in his authority. Tex. Penal Code Ann. § 31.01(1)(A), (C).

**[13] United States 393 &#128273;34**

393 United States
    393I Government in General
        393k34 k. Mints, assay offices, coinage, and money. Most Cited Cases

    Evidence supported defendant's conviction for money laundering arising out of scheme with client's general manager, pursuant to which general manager instructed defendant, who was partner of law firm that represented client, to hire lobbying consultant and retain attorney, and then have client reimburse law firm for salary and retainer fee, all without client's knowledge; client's funds became proceeds of criminal activity, namely, misapplication of client property, when funds were received by law firm, and defendant's subsequent transfer of funds to consultant and attorney, who essentially provided no services or benefit to client, was transaction that involved proceeds of criminal activity. Tex. Penal Code Ann. §§ 32.45(b), 34.02(a)(2).

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- S.W.3d ----, 2014 WL 6612510 (Tex.App.-Austin)
**(Cite as: 2014 WL 6612510 (Tex.App.-Austin))**

**[14] Embezzlement 146 ☞11(1)**

146 Embezzlement
    146k3 Elements of Offenses
        146k11 Conversion or Appropriation of Property
           146k11(1) k. In general. Most Cited Cases

    To prove misapplication of fiduciary property, the State was required to show that defendant (1) failed to hold victim's property according the terms of the agreement under which the property was held, and (2) the misapplication created a substantial risk of loss to the victim. Tex. Penal Code Ann. § 32.45(b).

**[15] Embezzlement 146 ☞11(1)**

146 Embezzlement
    146k3 Elements of Offenses
        146k11 Conversion or Appropriation of Property
           146k11(1) k. In general. Most Cited Cases

    On a charge for misapplication of fiduciary property, the actual disposition of the victim's property is immaterial, and the State is not required to prove how the defendant fiduciary disposed of the property, if the State has proved that the fiduciary failed to dispose of the property according to the terms of the agreement under which the property was held. Tex. Penal Code Ann. § 32.45(b).

**[16] Indictment And Information 210 ☞171**

210 Indictment and Information
    210XII Issues, Proof, and Variance
        210k170 Variance Between Allegations and Proof
           210k171 k. In general. Most Cited Cases

    Immaterial variances between the allegations in the indictment and the evidence introduced are to be disregarded when considering the sufficiency of the evidence to support a conviction.

**[17] United States 393 ☞34**

393 United States
    393I Government in General
        393k34 k. Mints, assay offices, coinage, and money. Most Cited Cases

    Variance between indictment on charge for misapplication of fiduciary property, which alleged that defendant, who was partner for law firm that represented client, caused client funds to be used to pay salary and retainer fee of

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- S.W.3d ----, 2014 WL 6612510 (Tex.App.-Austin)
**(Cite as: 2014 WL 6612510 (Tex.App.-Austin))**

lobbyist consultant and attorney respectively, who were hired and retained without client's knowledge, and evidence presented, was not variance involving element that defined or helped define allowable unit of prosecution for misapplication of fiduciary property, for purposes of determining when crime was complete, and therefore, whether funds were proceeds of criminal activity, as required to support conviction for money laundering, where manner in which defendant misapplied client's property was immaterial and did not describe element of offense. Tex. Penal Code Ann. §§ 32.45(b), 34.02(a)(2).

**[18] Indictment And Information 210 ☞171**

210 Indictment and Information
    210XII Issues, Proof, and Variance
        210k170 Variance Between Allegations and Proof
            210k171 k. In general. Most Cited Cases

There are three categories of variances between the allegations of an indictment and the evidence presented at trial in support of the charge: (1) a variance involving statutory language that defines the offense; (2) a variance involving a non-statutory allegation that describes an allowable unit of prosecution' element of an offense; and (3) other types of variances involving immaterial non-statutory allegations.

**[19] Criminal Law 110 ☞1167(1)**

110 Criminal Law
    110XXIV Review
        110XXIV(Q) Harmless and Reversible Error
            110k1167 Rulings as to Indictment or Pleas
                110k1167(1) k. Indictment or information in general. Most Cited Cases

**Indictment And Information 210 ☞171**

210 Indictment and Information
    210XII Issues, Proof, and Variance
        210k170 Variance Between Allegations and Proof
            210k171 k. In general. Most Cited Cases

A variance between an indictment's allegations involving statutory language that defines the offense and the evidence presented is always "material," and thus, reversible error; when an indictment alleges a specific statutory manner and means of committing an offense, then the State must prove that specific manner and means.

**[20] Criminal Law 110 ☞1167(1)**

110 Criminal Law

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- S.W.3d ----, 2014 WL 6612510 (Tex.App.-Austin)
**(Cite as: 2014 WL 6612510 (Tex.App.-Austin))**

110XXIV Review
110XXIV(Q) Harmless and Reversible Error
110k1167 Rulings as to Indictment or Pleas
110k1167(1) k. Indictment or information in general. Most Cited Cases

**Indictment And Information 210 ⊙⇒171**

210 Indictment and Information
210XII Issues, Proof, and Variance
210k170 Variance Between Allegations and Proof
210k171 k. In general. Most Cited Cases

A variance between an indictment involving a non-statutory allegation that describes an allowable unit of prosecution element of an offense and the evidence presented can be "material," and therefore, reversible error, if it is significant enough that a reviewing court could not conclude whether the State had proved the same offense alleged in the indictment.

**[21] Indictment And Information 210 ⊙⇒171**

210 Indictment and Information
210XII Issues, Proof, and Variance
210k170 Variance Between Allegations and Proof
210k171 k. In general. Most Cited Cases

Variances between immaterial non-statutory allegations in an indictment and the evidence presented are always immaterial, and therefore, do not affect the sufficiency of the evidence to support a conviction.

**[22] United States 393 ⊙⇒34**

393 United States
393I Government in General
393k34 k. Mints, assay offices, coinage, and money. Most Cited Cases

Variance between evidence presented and indictment on charge for misapplication of fiduciary property, which alleged that defendant, who was partner for law firm that represented client, caused client funds to be used to pay salary and retainer fee of lobbyist consultant and attorney respectively, who were hired and retained without client's knowledge, was variance involving immaterial non-statutory allegations, and therefore, was immaterial to determination when crime was completed, for purposes of determining whether funds used by defendant were proceeds of criminal activity, as required to support conviction for money laundering. Tex. Penal Code Ann. §§ 32.45(b), 34.02(a)(2).

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- S.W.3d ----, 2014 WL 6612510 (Tex.App.-Austin)
**(Cite as: 2014 WL 6612510 (Tex.App.-Austin))**

**[23] Sentencing And Punishment 350H 🗝1937**

350H Sentencing and Punishment
    350HIX Probation and Related Dispositions
        350HIX(F) Disposition of Offender
           350Hk1933 Confinement and Probation
                350Hk1937 k. Different offenses or convictions. Most Cited Cases

Trial court had authority to order that defendant serve jail time, as condition of community supervision, of 140 days for misapplication of fiduciary property, and 180 days for money laundering, and that they be served consecutively for total of 320 days, under article authorizing trial court to order maximum confinement in jail of 180 days as condition of community supervision for felony offense, "per felony conviction." Tex. Code Crim. Pro. Ann. art. 42.12 § 12(a).

**[24] Jury 230 🗝149**

230 Jury
    230VI Impaneling for Trial, and Oath
        230k149 k. Discharge of juror or jury pending trial. Most Cited Cases

Trial court's determination that juror had become "disabled," as basis for removal, due to significant pain and what juror believed might be bladder infection, was not abuse of discretion, in trial for misapplication of fiduciary property, theft by deception, and money laundering; although juror stated that she generally took medication for this type of pain and that medication was suppose to clear up infection, juror did not know if condition was minor infection and was not certain that she would be better on following day. Tex. Crim. Proc. Code Ann. art. 36.29(a).

**[25] Jury 230 🗝149**

230 Jury
    230VI Impaneling for Trial, and Oath
        230k149 k. Discharge of juror or jury pending trial. Most Cited Cases

"Disabled," as used the article authorizing the removal of a juror who becomes disabled from sitting, means any condition that inhibits the juror from fully and fairly performing the functions of a juror. Tex. Crim. Proc. Code Ann. art. 36.29.

**[26] Jury 230 🗝149**

230 Jury
    230VI Impaneling for Trial, and Oath
        230k149 k. Discharge of juror or jury pending trial. Most Cited Cases

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- S.W.3d ----, 2014 WL 6612510 (Tex.App.-Austin)
**(Cite as: 2014 WL 6612510 (Tex.App.-Austin))**

A condition that can render a juror disabled from sitting can include physical illness, mental condition, or emotional state which hinders one's ability to perform one's duties as a juror. Tex. Crim. Proc. Code Ann. art. 36.29(a).

**[27] Jury 230 🗝149**

230 Jury
    230VI Impaneling for Trial, and Oath
        230k149 k. Discharge of juror or jury pending trial. Most Cited Cases

The determination as to whether a juror is disabled from sitting on the jury, as the basis for the juror's removal, is within the discretion of the trial court. Tex. Crim. Proc. Code Ann. art. 36.29(a).

FROM THE DISTRICT COURT OF BLANCO COUNTY, 424TH JUDICIAL DISTRICT, NO. CR–1016, HONORABLE DANIEL H. MILLS, JUDGE PRESIDINGJames C. Ho, Gibson, Dunn & Crutcher LLP, Daniel L. Geyser, McKool Smith, PC, Dallas, TX, E.G. (Gerry) Morris, Law Office of E.G. Morris, Austin, TX, for appellant.

Bill Davis, Dustin M. Howell, Assistant Solicitor General, Office of the Attorney General, Austin, TX, for Appellee.

Before Chief Justice Jones, Justice Pemberton and Field

### *OPINION*

Scott K. Field, Justice

**\*1** A jury found appellant Walter Demond guilty of misapplication of fiduciary property, theft by deception, and money laundering. *See* Tex. Penal Code §§ 31.03, 32.45, 34.02. The jury assessed punishment at ten years' imprisonment for each offense, but recommended that the sentences be suspended and Demond be placed on community supervision. Demond raises eight issues on appeal. We affirm the trial court's judgments in part, reverse and vacate in part, and modify the conditions of Demond's community supervision.

### BACKGROUND

The Pedernales Electric Cooperative (PEC) is a member-owned utility that provides electrical service to twenty-four counties in Central Texas. *See* Tex. Util.Code §§ 161.001–.254 (describing formation and operation of utility cooperatives). Any resident in the PEC's service area is required to join the PEC in order to receive electric service, and as of 2008 the PEC had over 225,000 members.

Demond was a partner at Clark, Thomas & Winters, PC (Clark Thomas), a law firm that had represented the PEC for several decades. Demond was the head of Clark Thomas's "energy group," which was the section of the firm that handled the PEC's representation. Demond's primary contact at the PEC was Bennie Fuelberg, who was the PEC's general manager from 1976 until 2008. Fuelberg was given broad authority to oversee the PEC's day-to-day operations, including expenditures on outside consultants.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- S.W.3d ----, 2014 WL 6612510 (Tex.App.-Austin)
**(Cite as: 2014 WL 6612510 (Tex.App.-Austin))**

**The parties' theories of the case**

The State alleges that between November 1996 and March 2007, Fuelberg conspired with Demond to funnel over $200,000 in PEC funds to Fuelberg's brother, Curtis, and William Price, the son of a former PEC board member. [FN1] According to the State, Fuelberg instructed Demond to hire Curtis as a consulting lobbyist for Clark Thomas and then have Clark Thomas bill the PEC $5,000 per month to pay the majority of Curtis's salary. Similarly, the State asserts that beginning in 2003, Fuelberg instructed Demond to have Clark Thomas pay Price a $2,000 monthly retainer and then bill the PEC for the cost of the retainer. All told, the State's forensic accountant testified that the PEC paid Clark Thomas $630,000 for Curtis's salary and $86,000 for Price's retainer.

> FN1. We refer to Curtis Fuelberg by his first name to avoid confusion.

The State contends that the PEC received no benefit from Curtis's and Price's employment. The State notes that Price did not know that his retainer was being paid by the PEC and that Price never performed any legal work for the PEC even though there was work available. Similarly, the State emphasizes that Curtis did not register as a lobbyist for the PEC, and therefore he was prohibited from directly communicating with "the legislative or executive branch to influence legislation or administrative action on behalf of" the PEC. *See* Tex. Gov't Code §§ 305.003(b) (requiring lobbyists to register with Texas Ethics Commission), .031 (making violation of registration requirement a Class A misdemeanor). Thus, the State contends that Price and Curtis were "sham hires," meaning Fuelberg and Demond intentionally paid Price and Curtis with PEC funds, all the while knowing that the PEC would receive little or no benefit from Price's or Curtis's employment.

**\*2** Furthermore, according to the State, Fuelberg and Demond went to great lengths to hide these payments from the PEC and Clark Thomas. Through a complex "billing scheme," Fuelberg allegedly instructed Demond to have Clark Thomas bill the PEC $30,000 every six months between 1996 and 2003, identify these payments as "legal services rendered in connection with regulatory and legislative services," then have Clark Thomas pay Curtis $6,000 per month—$5,000 of which came from the PEC.[FN2] Similarly, when Clark Thomas began paying Price's $2,000 monthly retainer, Demond personally added $7,000 per month to the PEC's bill to cover both the PEC's share of Curtis's salary and Price's retainer. This $7,000 "mark up" in the PEC's bill did not include an explanation of what these payments were for, which the State asserts made it impossible for the PEC to determine how its money was being spent. When the PEC's "legal services manager" contacted Demond to get an explanation for these $7,000 payments, Fuelberg instructed Demond to ignore that request and direct all of Clark Thomas's bills to Fuelberg for approval. Similarly, when another partner at Clark Thomas asked Demond if the PEC was paying for Curtis's salary, Demond initially said no, but then said that the PEC's board of directors knew about and had approved the $7,000 monthly payments to Curtis and Price.

> FN2. Demond would later testify that Fuelberg suggested that Clark Thomas should also contribute to Curtis's salary but that the PEC's "share" of Curtis's salary was always $5,000 per month.

Fuelberg retired from the PEC in February 2008. One month later, the PEC's new general manager hired Navigant Consulting to investigate and prepare a report about the PEC's outside consulting expenditures during Fuelberg's tenure. Part of Navigant's investigation included PEC's payments to Clark Thomas. On December 15, 2008, Navigant issued its report (the Navigant Report), detailing Fuelberg and Demond's alleged scheme to transfer PEC funds to

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- S.W.3d ----, 2014 WL 6612510 (Tex.App.-Austin)
**(Cite as: 2014 WL 6612510 (Tex.App.-Austin))**

Curtis and Price through Clark Thomas.

At trial, and again on appeal, Demond asserts that Fuelberg had the authority to hire any outside consultant he deemed appropriate, and therefore there was nothing unlawful about Fuelberg's hiring Curtis and Price through Clark Thomas. Demond, in fact, testified that Fuelberg informed him that the PEC board was aware of and approved this arrangement. Demond contends that Curtis provided valuable lobbying services for the PEC and that having Price on retainer was inherently valuable for both the PEC and Clark Thomas. According to Demond, both he and Fuelberg believed that Curtis and Price were worth what the PEC paid them, and therefore Demond should not be subject to criminal liability merely because the State or the jury, in hindsight, disagreed with their valuation of Curtis's and Price's services.

**Procedural history**

Seven months after the Navigant Report was issued, Fuelberg and Demond were each indicted for first-degree felony misapplication of fiduciary property, first-degree felony theft by deception, and second-degree felony money laundering. *See* Tex. Penal Code §§ 31.03(e)(7) (making theft a first-degree felony if value of property stolen was more than $200,000), 32.45(c)(7) (same punishment range for misapplication of fiduciary property), 34.02(e)(3) (making money laundering a second-degree felony if value of fund is more than $100,000 but less than $200,000). Prior to trial, Fuelberg and Demond filed motions to disqualify or, alternatively, recuse the Honorable Daniel H. Mills from their respective cases. The motions asserted that as a PEC member, Judge Mills had a personal and pecuniary interest in this case and that a reasonable person might question Judge Mills's impartiality. Judge Mills declined to voluntarily recuse himself and referred the motions to the presiding judge, who assigned the motions to the Honorable Bert Richardson. *See* Tex.R. Civ. P. 18a (prescribing procedure for resolving motions to disqualify and recuse). Judge Richardson conducted a hearing, after which he denied Fuelberg's and Demond's motions.

Fuelberg and Demond were tried separately, with Demond's trial taking place three months after Fuelberg's. In Demond's trial, the State called a total of eighteen witnesses. Demond called a total of twenty-one witnesses, many of whom testified about the value of Curtis's lobbying work, including work on behalf of the PEC. Finally, Demond testified in his own defense, asserting that he believed Fuelberg had the authority to hire outside consultants of his choosing, that Fuelberg told him the PEC board was aware of these hires, and that Curtis and Price provided real value to the PEC.

**\*3** The jury found Demond guilty of the lesser-included offense of second-degree felony misapplication of fiduciary property, first-degree felony theft by deception as alleged, and second-degree felony money laundering as alleged. The jury assessed punishment at ten years' imprisonment for each offense, but recommended that the sentences be suspended and that Demond be placed on community supervision. The trial court rendered judgment consistent with the jury's verdict and ordered Demond to serve a total of 500 days in jail as a condition of his community supervision. This appeal followed.

### DISCUSSION

Demond raises eight issues on appeal, which we group into the following six complaints. First, Demond asserts that the evidence is insufficient to support his convictions. Second, he claims that there is a material variance between the indictment and the evidence adduced at trial. Third, he contends that the trial court could not require him to spend

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- S.W.3d ----, 2014 WL 6612510 (Tex.App.-Austin)
**(Cite as: 2014 WL 6612510 (Tex.App.-Austin))**

more than 180 days in jail as a condition of his community supervision. Fourth, Demond argues that his convictions for misapplication of fiduciary property and theft violate the prohibition against double jeopardy. Fifth, Demond asserts that Judge Mills should have been disqualified or recused from presiding over his case. Finally, Demond asserts that the trial court erred in dismissing a juror as disqualified based on the juror's temporary medical condition. We address Demond's material-variance argument first.

**Variance between indictment and evidence at trial**

[1]In his third appellate issue, Demond asserts that there is a material variance between the indictment and the evidence produced at trial. Specifically, Demond argues that the indictment cannot support the State's theory that he was a party to Fuelberg's misapplication of fiduciary property. *See* Tex. Penal Code § 32.45. Under the law of parties, the defendant is culpable only if the State proves that (1) a principal actor committed the charged offense and (2) the defendant encouraged, directed, aided, or attempted to aid that offense. *See id.* §§ 7.01–.02(a)(2). According to Demond, however, the indictment alleges that he misapplied property which *he* held as a fiduciary, and thus it was a material variance for the State to prove that he helped Fuelberg misapply property that *Fuelberg* held as a fiduciary.

[2][3][4]"A 'variance' occurs whenever there is a discrepancy between the allegations in the indictment and the proof offered at trial." *Byrd v. State,* 336 S.W.3d 242, 246 (Tex.Crim.App.2011) (citing *Gollihar v. State,* 46 S.W.3d 243, 246 (Tex.Crim.App.2001)). However, a variance is material—and thus reversible error—only if it "fails to give the defendant sufficient notice [of the offense alleged] or would not bar a second prosecution for the same" crime. *See id.* at 247–48. It is well established that the indictment need not "include notice that the State will attempt to prove its case under the law of parties." *Marable v. State,* 85 S.W.3d 287, 292 (Tex.Crim.App.2002) (Cochran, J., concurring) (internal citations omitted); *see also Powell v. State,* 194 S.W.3d 503, 506 (Tex.Crim.App.2006) (unanimous opinion citing *Marable,* 85 S.W.3d at 288, for same proposition). Therefore, an accused may be convicted as a party to the offense even if the indictment does not explicitly charge him as a party. *See Boston v. State,* 373 S.W.3d 832, 837 (Tex.App.—Austin 2012), *aff'd,* 410 S.W.3d 321, 327 (Tex.Crim.App.2013).

In this case, the indictment alleges, in relevant part, that:

[Demond] intentionally or knowingly misapplied property, that being: money of the [PEC], contrary to an agreement under which the Defendant held the property as a fiduciary and in a manner that involved substantial risk of loss to PEC, the owner of the property and the person for whose benefit the property was held, by making or causing payments to be made to Curtis Fuelberg, who is Bennie Fuelberg's brother, and to William Price, and the aggregate value of the property misapplied was more than $200,000.

**\*4** Demond asserts that because the indictment alleges that he misapplied property that he held as the PEC's fiduciary, the State could not assert at trial that he was a party to misapplication of property that Fuelberg held as a fiduciary. *See* Tex. Penal Code §§ 7.01–.02(a)(2) (defining criminal liability for parties to an offense). This Court recently rejected a nearly identical argument in *Rainey v. State,* No. 03–11–00741–CR, 2013 WL 692477, at \*3–5 (Tex.App.—Austin Feb. 22, 2013, pet. ref'd) (mem. op., not designated for publication).

In *Rainey,* a defendant convicted of aggravated sexual assault asserted that "because the indictment allege[d] that *his* sexual organ penetrated [the victim's] mouth, it was a material variance for the State to prove that [the victim's]

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- S.W.3d ----, 2014 WL 6612510 (Tex.App.-Austin)
**(Cite as: 2014 WL 6612510 (Tex.App.-Austin))**

mouth was actually penetrated by the sexual organ of" another. *Id.* at \*4. We disagreed, explaining that "there is no reason why the indictment needs to provide notice that the law of parties as applied to the charged offense necessarily involved the use of another assailant's sexual organ." *Id.* at \*5. Given that "there is nothing in the language of the penal code to indicate that 'party liability is inappropriate' with respect to aggravated sexual assault," we concluded that the defendant's material-variance argument was inconsistent with both the sexual-assault statute and the law of parties. *Id.* (quoting *McIntosh v. State,* 52 S.W.3d 196, 200 (Tex.Crim.App.2001)).

Similarly here, for a defendant to be guilty as a party to misapplication of fiduciary property, another principal actor—in this case Fuelberg—would have to hold the property as a fiduciary, and the defendant would have to encourage, direct, aid, or attempt to aid the principal's misapplication of that property. Given that there is nothing in the language of the Penal Code to indicate that party liability is inappropriate with respect to misapplication of fiduciary property, the indictment did not need to specifically inform Demond that, under the law of parties, he would be liable for helping Fuelberg misapply property that Fuelberg held as a fiduciary. Therefore, we conclude that there is not a material variance between the indictment in this case and the evidence adduced at trial. We overrule Demond's third appellate issue.

**Sufficiency of the evidence**

In his first, second, and fifth issues on appeal, Demond argues that the evidence is insufficient to support his convictions in three respects. First, Demond claims that the evidence established that Fuelberg had the authority to hire any outside consultant he deemed appropriate without the need to seek the PEC board's approval. Second, Demond asserts that if the PEC received any benefit from Curtis's or Price's services, then the PEC's money was not stolen or misapplied as a matter of law. Third, Demond contends that he cannot be convicted of money laundering because the PEC's money did not become the "proceeds of criminal activity" until Curtis and Price received payment from Clark Thomas, which was the last transaction in this offense, and thus Demond never transferred the proceeds of criminal activity. We will briefly discuss the applicable standard of review and elements of each offense before addressing Demond's arguments.

*Standard of review and elements of each offense*

In reviewing the sufficiency of the evidence to support a conviction, we determine whether a rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt. *Brooks v. State,* 323 S.W.3d 893, 895 (Tex.Crim.App.2010). In making this determination, we consider all evidence that the trier of fact was permitted to consider, regardless of whether it was rightly or wrongly admitted. *Clayton v. State,* 235 S.W.3d 772, 778 (Tex.Crim.App.2007); *Allen v. State,* 249 S.W.3d 680, 688–89 (Tex.App.—Austin 2008, no pet.). We view this evidence in the light most favorable to the verdict. *Clayton,* 235 S.W.3d at 778. The jury, as the trier of fact, is the sole judge of the credibility of the witnesses and the weight to be given to their testimony. *Id.* Therefore, we presume that the jury resolved any conflicting inferences and issues of credibility in favor of the judgment. *Id.*

**\*5** To prove misapplication of fiduciary property, the State was required to show beyond a reasonable doubt that Demond intentionally or knowingly [FN3] (1) misapplied property (2) that he held as a fiduciary (3) in a manner that involved a substantial risk of loss to the owner of the property or to the person for whose benefit the property was held. *See* Tex. Penal Code § 32.45(b); *Bowen v. State,* 374 S.W.3d 427, 431 (Tex.Crim.App.2012). " 'Misapply' means deal with property contrary to: (A) an agreement under which the fiduciary holds the property; or (B) a law prescribing the

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- S.W.3d ----, 2014 WL 6612510 (Tex.App.-Austin)
**(Cite as: 2014 WL 6612510 (Tex.App.-Austin))**

custody or disposition of the property." Tex. Penal Code § 32.45(a)(2). A "substantial risk of loss" has been interpreted to mean that it must be "more likely than not" that the property would be lost. *Casillas v. State,* 733 S.W.2d 158, 164 (Tex.Crim.App.1986).

> FN3. Generally, a defendant can be liable for intentionally, knowingly, or recklessly misapplying fiduciary property. *See* Tex. Penal Code § 32.45. However, the indictment in this case alleged only that Demond intentionally or knowingly misapplied the PEC's property and, therefore, he could not be convicted for the less culpable mental state of recklessness. *See Reed v. State,* 117 S.W.3d 260, 264–65 (Tex.Crim.App.2003) (concluding trial court erred in instructing jury on less culpable mental state of recklessness that was not alleged in indictment).

To establish theft, the State was required to prove that Demond (1) unlawfully appropriated the PEC's property (2) with the intent to deprive the PEC of its property. *See* Tex. Penal Code § 31.03(a). In this case, the appropriation was allegedly unlawful because "it [was] without the owner's effective consent." *See id.* § 31.03(a). Specifically, the indictment alleges that the PEC's consent was ineffective because it was induced by deception. *See id.* § 31.01(3)(A); *see also Geick v. State,* 349 S.W.3d 542, 547–48 (Tex.Crim.App.2011) (concluding that when indictment alleges theft by deception, State is limited to that theory of effective consent). Thus, the State was required to show that the PEC "actually relied upon the defendant's deceptive acts" when giving its consent. *Daugherty v. State,* 387 S.W.3d 654, 659 n. 18 (Tex.Crim.App.2013). A defendant intentionally "deprives" an owner of his property if the defendant "dispose[s] of property in a manner that makes recovery of the property by the owner unlikely." *See* Tex. Penal Code § 31.01(2)(C).

Finally, to convict Demond of money laundering, the State was required to prove that he knowingly (1) acquired, maintained an interest in, concealed, possessed, or transferred (2) the proceeds of a criminal activity—to wit, theft of money or misapplication of fiduciary property valued at more than $100,00 but less than $200,000. *See id.* § 34.02(a)(1)-(2). " 'Proceeds' means funds acquired or derived directly or indirectly from, produced through, realized through, or used in the commission of an act." *Id.* § 34.01(4)(A). "Criminal activity" is defined as "any offense, including any preparatory offense, that is classified as a felony under the laws of this state or the United States." *Id.* § 34.01(1)(A).

At trial, the State primarily asserted that Demond was liable as a party to Fuelberg's criminal conduct. For a defendant to be guilty as a party to an offense, another principal actor—in this case Fuelberg—would have to commit the underlying offense, and the defendant would have to intentionally encourage, direct, aid, or attempt to aid the principal's commission of that offense. *See id.* § 7.02. Therefore, with respect to this party theory of liability, the State was required to prove (1) that Fuelberg committed the above offenses; (2) that Demond acted with the intent to promote or assist the commission of those offenses; and (3) that Demond encouraged, directed, aided, or attempted to aid Fuelberg's commission of those offenses. *See id.* §§ 7.01–.02(a)(2).

**\*6** [5]Our analysis will focus on whether the evidence is sufficient to prove that Demond is liable as a party to Fuelberg's misapplication of fiduciary property. However, we will primarily consider whether Demond is guilty of theft by deception based on his own conduct. Circumstantial evidence may be used to prove the defendant is a party to an offense, and a factfinder may look to events occurring before, during, and after the commission of the offense that

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- S.W.3d ----, 2014 WL 6612510 (Tex.App.-Austin)
**(Cite as: 2014 WL 6612510 (Tex.App.-Austin))**

show an understanding or common design to do the prohibited act. *See Gross v. State,* 380 S.W.3d 181, 186 (Tex.Crim.App.2012).

*Fuelberg's authority to hire outside consultants*

[6]In his first issue on appeal, Demond asserts that Fuelberg had the "actual authority" to hire Curtis and Price without notifying or seeking the approval of the PEC's board. According to Demond, "[t]here is no such thing as theft or misapplication by spending a company's money with the company's permission" and, therefore, Fuelberg could not be guilty of stealing or misapplying the PEC's money because he had the authority to hire outside consultants as he saw fit. Given that Fuelberg was not guilty of the charged offenses, Demond asserts that he could not be guilty as a party to Fuelberg's conduct. *See Barnes v. State,* 62 S.W.3d 288, 298 (Tex.App.—Austin 2001, pet. ref'd) ("If the State is to prove the accused's guilt as a party, it must first prove the guilt of another as the primary actor.").

Although not framed in these terms, we understand Demond's argument to be that the evidence is insufficient to prove that Fuelberg lacked the authority to hire Curtis and Price. With respect to theft by deception, Fuelberg's actual authority to hire outside consultants is not dispositive because if Fuelberg obtained or retained his authority through deception, then the PEC's grant of authority to Fuelberg would be ineffective. *See, e.g., Bender v. State,* No. 03–09–00652–CR, 2011 WL 1561994, *9–10 (Tex.App.—Austin Apr. 19, 2011, pet. ref'd) (mem. op., not designated for publication) (concluding evidence sufficient to show manager obtained investment capital through deception by promising he would not draw salary until company was profitable). With respect to the misapplication-of-fiduciary-property charge, however, Demond's argument would mean that because Fuelberg had the actual authority to hire Curtis and Price, the evidence is insufficient to establish that Fuelberg dealt with the PEC's property contrary to the fiduciary agreement under which it was held. *See* Tex. Penal Code § 32.45(a)(2)(A).

The undisputed evidence admitted at trial established that Fuelberg had broad authority to hire both PEC employees and outside consultants. As one former PEC director stated, Fuelberg "had the authority to hire and fire whomever he wanted as long as it wasn't prohibited by the [PEC's] bylaws." The primary bylaw that was discussed at trial was the PEC's "Nepotism Policy," which stated that "the employment of close relatives shall be discouraged" and that "[c]ompensation, if any, of any officer or an employee who is also a director or close relative of a director shall be fixed by the board of directors." However, it is undisputed that Curtis and Price were outside consultants rather than PEC employees, and as such their salaries were not covered by the Nepotism Policy. There is no evidence to indicate that any other PEC bylaw limited Fuelberg's authority to hire outside consultants. Thus, although the PEC generally discouraged hiring close relatives, the evidence established that Fuelberg was not required to inform the PEC board or seek its approval before hiring outside consultants—including Curtis and Price.

**\*7** Nevertheless, there was evidence adduced at trial which demonstrated that Fuelberg did not have the authority to spend PEC funds in a way that he knew would not benefit the PEC. Fuelberg's employment contract states that he was required to "perform all of his duties properly and faithfully in the best interest of the PEC." Similarly, the PEC's "Causes for Disciplinary Action"—applicable to all PEC employees since 1979—states that "[d]ishonesty, willful damage and/or unauthorized appropriation of Cooperative funds or property" are grounds for immediately terminating employment. This is consistent with the testimony of two former PEC board members and Demond's law partner at Clark Thomas, all of whom stated that Fuelberg's broad authority to conduct the PEC's day-to-day operations did not include the authority to misappropriate PEC funds as additional income for himself or as gifts to his family and

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- S.W.3d ----, 2014 WL 6612510 (Tex.App.-Austin)
**(Cite as: 2014 WL 6612510 (Tex.App.-Austin))**

friends. *See Bender,* 2011 WL 1561994, at *9 (noting that written partnership agreement provided that manager could only use company funds for "legitimate business purposes").

Therefore, if the jury determined that Fuelberg knew that the PEC would receive little or no benefit from Curtis's and Price's employment, then the jury could have found beyond a reasonable doubt that Fuelberg did not have the authority to make these payments to Curtis and Price. Thus, if Fuelberg knew that the PEC would receive little or no benefit from these hires, then there is sufficient evidence to prove that Fuelberg's transfer of PEC funds to Curtis and Price was contrary to the agreement under which Fuelberg held the PEC's property. *See* Tex. Penal Code § 32.45(a)(2)(A). We overrule Demond's first appellate issue. Next, we will consider whether the evidence is sufficient to support the jury's determination that Fuelberg knew that the PEC would receive little or no benefit from Curtis's and Price's employment.

*Does a finding of any value require acquittal?*

[7]In his second issue on appeal, Demond asserts that if the PEC received any value from Curtis's work as a lobbyist or Price's retainer, then the misapplication-of-fiduciary-property and theft charges fail as a matter of law. Specifically, Demond claims that he should not be held criminally liable merely because the jury second-guessed his and Fuelberg's determination of what Curtis's and Price's professional services were worth. According to Demond, this type of "ex post facto" valuation by the jury is inconsistent with the traditional deference the law affords to an executive's business judgment and would leave executives uncertain of when their business decisions could result in criminal liability.

Again, although not framed in these terms, Demond essentially argues that if the jury found that the PEC received any value from Curtis and Price, there cannot be sufficient evidence to support Demond's misapplication-of-fiduciary-property and theft convictions. Demond's argument can best be understood to mean that if Curtis and Price provided any value to the PEC, then Fuelberg and Demond must have believed that their estimation of Curtis's and Price's value was correct, and therefore Curtis and Price were not sham hires. Thus, according to Demond, unless the jury found that Curtis and Price produced no value for the PEC, there is no basis for the jury to infer that Fuelberg or Demond intentionally or knowingly misapplied or stole the PEC's money.

This argument relates to the sufficiency of the evidence to support three essential elements of theft and misapplication of fiduciary property: (1) Fuelberg's and Demond's culpable mental states, (2) Fuelberg's authority to hire Curtis and Price, and (3) the harm that resulted.[FN4] Regardless of which element Demond's argument is applied to, however, the ultimate issue is the same—if Curtis and Price provided some value to the PEC, could the jury nevertheless infer that Fuelberg and Demond intentionally stole all or part of Curtis's salary and Price's retainer? Because we conclude that the answer is yes, we find that the evidence is sufficient to support the jury's verdict.

FN4. With respect to the culpable mental state, if Fuelberg or Demond believed that Curtis and Price were worth what the PEC paid them, then Fuelberg and Demond did not (1) intentionally or knowingly misapply the PEC's property or (2) intentionally deprive the PEC of its property. *See* Tex. Penal Code §§ 31.03(a), 32.45(b). Similarly, as discussed above, if Fuelberg believed that Curtis and Price were worth what he was paying them, then Fuelberg was acting within his authority to hire the outside consultants that he deemed appropriate and, therefore, he did not deal with the PEC's property contrary to an agreement under which it

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- S.W.3d ----, 2014 WL 6612510 (Tex.App.-Austin)
**(Cite as: 2014 WL 6612510 (Tex.App.-Austin))**

was held. *See id.* § 32.45(a)(2)(A). Finally, with respect to harm, if Fuelberg or Demond had a good-faith belief that Curtis and Price were worth what the PEC paid them, then arguably (1) there was not a substantial risk of loss of the PEC's money and (2) neither Fuelberg nor Demond disposed of the PEC's money in a manner that made recovery of the money unlikely. *See id.* §§ 31.01(2)(C), 32.45(b).

**\*8** The problem with Demond's argument becomes apparent when we consider a slightly different set of facts. Assume that instead of lobbying, Curtis sold office supplies. If Fuelberg bought a $4,000 copy machine from Curtis for the PEC but then paid Curtis $5,000 for that copier, it would be obvious that Fuelberg misapplied and stole $1,000 from the PEC. Furthermore, if Fuelberg instructed Demond to have Clark Thomas purchase that same copier for the same $5,000, then have Clark Thomas bill the PEC for the expense, Demond could be culpable as a party to Fuelberg's theft and misapplication of PEC funds if Demond knew that the PEC was overpaying for the copier. Thus, the fact that PEC may have received some benefit from Fuelberg's purchase—and therefore the amount that Fuelberg paid Curtis was not entirely stolen—does not mean that Fuelberg and Demond cannot be criminally liable for the amount that they intentionally overpaid.

Admittedly, the value of professional services may be more open to interpretation than the value of tangible goods whose fair-market price is often readily identifiable. Arguably, this is even more true for lobbying services or legal work because an individual lobbyist or lawyer may be particularly valuable depending on his or her abilities, experience, and relationships with relevant legislators or judges, factors that may be difficult for a jury to evaluate. Thus, it is not enough that the jury simply believed that, in hindsight, Demond and Fuelberg overestimated Curtis's and Price's value. Rather, there must be sufficient evidence from which the jury could infer that Demond and Fuelberg intended to overpay Curtis and Price throughout the course of their alleged scheme. With this framework in mind, we consider whether the record supports the jury's determination that Fuelberg and Demond intended to overpay Curtis and Price.

*Price's retainer*

[8]There is ample evidence from which the jury could infer that Fuelberg and Demond never intended for the PEC to receive any benefit for Price's $2,000 monthly retainer. Admittedly, there was testimony that having a lawyer on retainer has value regardless of whether the lawyer ultimately performs any work. However, Price testified that he never knew that PEC was paying his retainer, was never advised that he might be doing work for the PEC, and was never given any work for the PEC. Furthermore, Demond admitted on cross-examination that during the years that Price was on retainer, Clark Thomas performed work for the PEC that Price was qualified to handle and the work would have cost less than $2,000, meaning that Price could have performed the work at no additional cost to the PEC. When pressed for an explanation as to why Price was not used on these projects, Demond simply stated "I wish I had thought of that."

Based on Price's testimony that he was never informed that the PEC was paying his retainer and Demond's inability to explain why Price was not given PEC work when it was available, the jury could have reasonably inferred that Fuelberg and Demond never intended for the PEC to receive any benefit from having Price on retainer. Thus, there is sufficient evidence to support the jury's conclusion that Fuelberg misapplied the entire $86,000 in PEC funds that was used to pay Price's retainer. In reaching this conclusion, we in no way seek to impugn Price's abilities or value as an attorney; we are merely explaining that the jury could have reasonably concluded that Demond and Fuelberg never intended to utilize Price's legal services for the benefit of the PEC.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- S.W.3d ----, 2014 WL 6612510 (Tex.App.-Austin)
**(Cite as: 2014 WL 6612510 (Tex.App.-Austin))**

*Curtis's salary*

[9]There is, admittedly, more conflicting evidence concerning Curtis's value as a lobbyist for the PEC. Mike Williams is the president and chief executive officer of Texas Electric Cooperatives (the "Coop Association"), a trade association providing "legislative political advocacy services" on behalf of electric cooperatives in Texas, including the PEC. Williams testified that during the 1997 and 1999 legislative sessions, the Texas Legislature was in the process of deregulating electric utilities, which could have significantly impacted all utility cooperatives. *See generally Cities of Corpus Christi v. Public Util. Comm'n,* 188 S.W.3d 681, 687 (Tex.App.—Austin 2005, pet. denied) (discussing legislative history and purpose of utility deregulation). According to Williams, Fuelberg contacted him in 1996 and suggested that Williams hire Curtis to help the Coop Association's lobbying team in exchange for the PEC contributing $70,000 to the association. Williams agreed and contracted to pay Curtis $4,000 per month. However, Williams stated that some of the association's members "were uncomfortable with the fact that we had hired the brother of one of the managers of one of our systems," especially after the members learned how much the PEC had contributed to the association's lobbying efforts. Although the Coop Association intended to honor its contract with Curtis, Curtis voluntarily terminated his relationship with the association at the end of October 1996, approximately five months after he was originally retained.

**\*9** Demond testified that Fuelberg approached him in October 1996—the same month that Curtis stopped working for the Coop Association—and suggested that Demond call Curtis to get his opinion about how deregulation might affect the PEC. Demond recalled that he was impressed with Curtis's knowledge and suggested that the PEC or Clark Thomas pay Curtis for his advice. According to Demond, Fuelberg agreed and suggested that Clark Thomas hire Curtis as a consulting lobbyist, with the PEC contributing $5,000 per month for Curtis's salary and Clark Thomas contributing an additional $1,000 or $2,000. Demond hired Curtis, telling him to "keep Pedernales Electric happy."

Curtis testified that he was a "legislative consultant," rather than a lobbyist, for the PEC. As Curtis explained, a legislative consultant keeps a client "informed of what's going on legislatively" but does not directly lobby legislators to "affect the outcome of legislation." Curtis admitted that he did not register as a lobbyist for the PEC and, therefore, was legally prohibited from contacting legislators or agency officials on behalf of the PEC. *See* Tex. Gov't Code § 305.003(b) (requiring lobbyists to register with Texas Ethics Commission). Furthermore, Curtis conceded that apart from Clark Thomas, no client had ever paid him more than $4,000 per month and that when he was receiving $4,000 per month, it was from large organizations like the Coop Association or American Electric Power during significant legislative sessions. [FN5]

> FN5. Williams testified that the Coop Association "staffed up" by adding Curtis in 1996 because deregulation could mean that all utility cooperatives would no longer be regulated by the Public Utility Commission. Similarly, Curtis explained that American Electric Power paid him $4,000 per month for two years to make sure the legislature did not facilitate a merger between two of his employer's main Texas competitors, both of which American Electric Power purchased in that time frame.

Several witnesses, including four current and former members of the Texas legislature, testified that Curtis was a well-respected and effective lobbyist. Some members of the legislature knew, or at least assumed, that Curtis was representing the PEC during legislative sessions despite the fact that Curtis was not registered as a lobbyist for the

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- S.W.3d ----, 2014 WL 6612510 (Tex.App.-Austin)
**(Cite as: 2014 WL 6612510 (Tex.App.-Austin))**

PEC. However, Williams testified that Curtis did not participate in the utility cooperatives' negotiations concerning deregulation in the 1997 and 1999 legislative sessions. Furthermore, Curtis's salary from the PEC—paid indirectly through Clark Thomas—did not change between 1996 and 2007, despite the fact that the PEC employed other lobbyists during this time and that there were no other potential legislative matters that would have impacted the PEC as much as deregulation. The jury could have reasonably inferred from this that Fuelberg intended to pay Curtis the same salary regardless of the amount of work he was performing for the PEC at any given time.

Arguably the most damning evidence was the considerable testimony and documentation concerning the lengths to which Demond and Fuelberg went in order to conceal Curtis's employment from the PEC. *See King v. State,* 29 S.W.3d 556, 565 (Tex.Crim.App.2000) (noting that defendant's false statements to conceal crime evidences consciousness of guilt); *Alvarez v. State,* No. 03–02–00262–CR, 2003 WL 22095777, at *8 (Tex.App.—Austin Sept. 11, 2003, no pet.) (mem. op., not designated for publication) (discussing how "insistence on secrecy" after commission of crime is strong indication of intent). On cross-examination, Demond admitted that he initially included a "line item for Curtis Fuelberg" in Clark Thomas's bill to the PEC, but Fuelberg called Demond and told him that "he didn't want his brother's name on the bill" because "he didn't want every clerk in the [PEC's] accounting department to know." Demond suggested that they identify Curtis's salary as "legislative consultant," but Fuelberg said that was also unacceptable. Finally, Demond and Fuelberg agreed to label Curtis's payment as "for legal services rendered in connection with regulatory and legislative matters"—despite the fact that Curtis was not a lawyer or other legal professional and therefore could not provide legal services.

**\*10** Furthermore, there was evidence that Demond evaded the PEC's inquiries into the monthly $7,000 fees that were being used to pay Curtis's salary and Price's retainer. Demond testified that when Luis Garcia, the PEC's legal services manager who was in charge of reviewing the PEC's outside legal fees, called Demond about these fees, Demond called Fuelberg to ask whether he should respond. Fuelberg instructed Demond to ignore Garcia's inquiry and to send all of Clark Thomas's bills directly to Fuelberg for approval. Garcia testified that this form of "block billing" made it impossible for the PEC to determine what it was being charged for.

Demond testified that he and Fuelberg concealed Curtis's employment from the PEC because Fuelberg was concerned that if other PEC employees knew about this arrangement, they might try to secure similar PEC consulting positions for their relatives. Assuming that this was a plausible explanation for not listing Curtis's name in Clark Thomas's bills, the jury could have reasonably determined that it did not explain why Curtis's lobbying work was listed as "legal services in connection with regulatory and legislative matters"—a heading which mischaracterizes the nature of the work being performed. Thus, the record reflects that Demond and Fuelberg concealed not only who was working for PEC, but also the nature of the work being performed, and therefore the jury could have reasonably discredited Demond's explanation of why he and Fuelberg concealed Curtis's employment from the PEC.

Additionally, there was evidence that Demond arguably misled other partners at Clark Thomas about the fact that the PEC was paying most of Curtis's salary and all of Price's retainer. David Duggins, a partner at Clark Thomas during the years relevant to this case, testified that Demond approached him in November of 2007 to ask if Clark Thomas should allow Curtis's and Price's contracts to expire. Duggins asked Demond if the PEC was paying for these contracts, and Duggins testified that Demond "told me no." Shortly after that conversation, Duggins heard "something about the PEC's share" of Curtis's and Price's contract. Duggins again asked Demond whether the PEC was paying for

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

these contracts, and it was only after being asked a second time that Demond explained that Fuelberg instructed him to pay Curtis and Price in this manner and then bill the PEC for their services.

Duggins conceded that when he initially asked Demond about Curtis's and Price's contracts, the PEC actually had stopped contributing payments for those contracts, and thus Demond's original answer that the PEC was not paying for Curtis and Price was technically true at that time.[FN6] Nevertheless, Duggins stated that he "would have preferred to know the whole story" when he asked. The jury could have inferred that Demond's original statement to Duggins denying that the PEC was paying for Curtis's and Price's contracts, although technically true, was intended to mislead Duggins about Demond's arrangement with Fuelberg. *See Bell v. State,* 26 S.W.3d 516, 521–22 (Tex.App.—Houston [1st Dist.] 2000, pet. ref'd) (noting that literally true statements can be deliberately misleading and thus support perjury conviction).

> FN6. The PEC's contribution for Curtis's salary and Price's retainer ended in March of 2007.

The Court does not lack sympathy for Demond's concern that a jury should not be allowed to determine the value of a business decision made by a company's executive. Whether a given business decision is motivated by an intent to deprive a company of its property is an inherently difficult issue to determine and will inevitably turn on the particular facts of a given case. However, juries are required to make such value judgments under the Penal Code, and it is not the Court's place to second-guess the jury so long as its decision is supported by evidence in the record.

**\*11** In this case, the jury heard testimony that:

• Demond and Fuelberg intentionally concealed Curtis's payments from the PEC's accounting department and Garcia;

• Demond misled Duggins about the fact that the PEC had been paying for Clark Thomas's contracts with Curtis and Price;

• Curtis was hired by Clark Thomas the same month that he stopped working for the Coop Association, at least in part, because the association's members had concerns about employing the PEC general manager's brother given that the PEC contributed a large sum to the Coop Association's lobbying efforts;

• Curtis was not registered as a lobbyist for the PEC, and therefore could only "keep his ear to the ground" rather than directly lobby the legislature;

• Even as a registered lobbyist, Curtis had never been paid more than $4,000 per month by any other employer, despite the fact that he worked for other large companies on significant legislative issues;

• Curtis's salary remained unchanged regardless of whether there was major legislation affecting the PEC; and

• Demond and Fuelberg used the same payment scheme to bill Curtis's salary as they did to conceal Price's retainer,

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

and thus the jury could infer that Curtis's salary was similarly a sham. *See* Tex. Penal Code § 31.03(c)(1) (providing that evidence indicating defendant participated in "recent transactions other than, but similar to, that which the prosecution is based is admissible for the purpose of showing knowledge or intent.").

Based on this record, the jury could have reasonably concluded beyond a reasonable doubt that Fuelberg intentionally and knowingly overpaid Curtis for his services. Furthermore, the jury could have reasonably determined that, at a minimum, this intentional overpayment resulted in misapplication of $1,000 per month in PEC funds for 126 months because Curtis's services to the PEC could not have been worth more than $4,000 per month. Thus, the jury could have reasonably concluded that Fuelberg intentionally misapplied $126,000 of the PEC's money to overpay Curtis. *See id.* § 31.09 (noting that amounts of individual theft may be aggregated as one offense if part of "one scheme or continuing course of conduct"). Having already concluded that there is sufficient evidence to find that the entire $86,000 used to pay Price's retainer was misapplied, we conclude that there is sufficient evidence to support the jury's finding that Fuelberg misapplied PEC property valued at more than $100,000 but less than $200,000.[FN7]

> FN7. The jury convicted Demond of second-degree felony misapplication of fiduciary property, indicating that the value of the property misapplied was between $100,000 and $200,000, but convicted him of first-degree felony theft, indicating that the value of the money stolen was more than $200,000. This apparent inconsistency does not affect our sufficiency analysis, however, because "[i]nconsistent verdicts do not necessarily imply that the jury convicted the defendant on insufficient evidence, but may simply stem from the jury's desire to be lenient or to execute its own brand of executive clemency." *Thomas v. State,* 352 S.W.3d 95, 101 (Tex.App.—Houston [14th Dist.] 2011, pet. ref'd); *see also Williams v. State,* No. 03–11–00598–CR, 2013 WL 6921489, at *6 (Tex.App.—Austin Dec. 31, 2013, pet. ref'd) (mem. op., not designated for publication) (citing several cases for same proposition), *cert. denied,* ––– U.S. ––––, 135 S.Ct. 103, ––– L.Ed.2d –––– (2014).

**\*12** Similarly, the jury heard considerable evidence about the lengths that Demond went to in order to assist Fuelberg in concealing Curtis's salary and Price's retainer. Demond himself admitted that he mischaracterized Curtis's lobbying work as legal services. Additionally, when Garcia—who was responsible for overseeing the PEC's expenditures on outside legal work—asked Demond to explain Clark Thomas's bill, Demond immediately asked Fuelberg if he had to respond and then accepted Fuelberg's instruction to ignore Garcia's inquiry and direct all bills directly to Fuelberg for approval. Based on this evidence, the jury could have reasonably concluded that Demond intentionally assisted Fuelberg's misapplication of PEC funds, and therefore Demond was liable as a party to that offense. *See id.* § 7.01(a).

*Consent induced by deception*

[10]Because the State alleged that Demond committed theft *by deception,* the relevant unlawful conduct for theft is slightly different from that which would support misapplication of fiduciary property. *See Geick,* 349 S.W.3d at 547–48 (concluding that if indictment alleges theft by deception, State is limited to that theory of theft). To constitute theft by deception, the victim's consent to the defendant's control over the property is ineffective because the consent was "induced by deception," meaning that the victim relied on the defendant's deceptive act when giving his consent. Tex. Penal Code § 31.01(3)(A); *see also Daugherty,* 387 S.W.3d at 659 n. 18 (citing *Swope v. State,* 723 S.W.2d 216, 223 (Tex.App.—Austin 1986), *aff'd on other grounds,* 805 S.W.2d 442 (Tex.Crim.App.1991)). "The reliance need not

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- S.W.3d ----, 2014 WL 6612510 (Tex.App.-Austin)
**(Cite as: 2014 WL 6612510 (Tex.App.-Austin))**

be the sole, or even controlling, reason why the victim decided to provide [his consent], but it must be a substantial or material factor in the decision-making process." *Daugherty,* 387 S.W.3d at 659 n. 18 (internal citations omitted).

[11]Deception is defined as, among other things, "(1) creating or confirming by words or conduct a false impression of law or fact that is likely to affect the judgment of another in the transaction, and that the actor does not believe to be true or (2) preventing another from acquiring information likely to affect his judgment in the transaction." Tex. Penal Code § 31.01(1)(A), (C). It is clear from the record discussed above that there is sufficient evidence that both Fuelberg and Demond deceived the PEC. According to Demond's own testimony, Fuelberg instructed him to change Clark Thomas's bills to the PEC so that those reviewing the PEC's expenses could not determine that it was indirectly paying Curtis and Price. Therefore, the relevant issue is whether there is sufficient evidence to establish that the PEC relied on Fuelberg's or Demond's deception before giving its consent.

It is somewhat difficult to envision how these deceptive acts induced the PEC to give Fuelberg broad authority to hire outside consultants. A PEC director testified that Fuelberg was given this broad authority decades before any of the alleged wrongdoing in this case. Furthermore, there is no allegation that Fuelberg secured this initial grant of authority through any express or implied promise, factual assertion, or other misrepresentation that is relevant here. [FN8] *See Daugherty,* 387 S.W.3d at 658 (noting that deception must occur before victim provided services to prove theft of services by deception); *Swope,* 723 S.W.2d at 223 (noting that victim's consent must result from reliance on deception). Thus, to prove that Demond was guilty as a party to Fuelberg's theft by deception, the State was required to show that the PEC would have potentially reined in or revoked Fuelberg's authority to hire outside consultants had the PEC known that its funds were being paid to Curtis and Price. There is no direct testimony to that effect, and thus the jury would have had to make some inferences about the PEC board's potential reaction to the deception.

> FN8. Even if the PEC's original grant of authority was based on Fuelberg's assurance that he would only use PEC resources for the PEC's benefit, there was no evidence that Fuelberg did not intend to honor that assurance at the time.

**\*13** [12]In considering Demond's liability as a principal actor, there is evidence that his deceptive billing practices induced the PEC to unknowingly reimburse Clark Thomas for Curtis's salary and Price's retainer. *See Higginbotham v. State,* 356 S.W.3d 584, 589–90 (Tex.App.—Texarkana 2011, pet. ref'd) (concluding that evidence sufficient to prove theft by deception where contractor billed customer for expenses that contractor did not incur). As discussed above, Demond mislabeled Clark Thomas's bill for Curtis's salary as legal services even though Curtis was not a lawyer. Similarly, when Price began his retainer with Clark Thomas, Demond began adding a $7,000 line-item expense to Clark Thomas's bill to the PEC to cover both Curtis's salary and Price's retainer. There was testimony that because this block-billing did not identify what the PEC was paying for, it was impossible for the PEC to discover that these payments were being made for Curtis and Price. However, there is no direct testimony that if Clark Thomas's bills had accurately reflected that payments were being made to Curtis and Price, the PEC would not have consented to reimburse Clark Thomas for those payments.

Thus, we must consider whether there is sufficient circumstantial evidence from which the jury could infer that the PEC's decision to reimburse Clark Thomas for Curtis's and Price's income was materially affected by Demond's deceptive billing. *See Daugherty,* 387 S.W.3d at 659 n. 18. The record need not show that but for Demond's deception,

the PEC would not have approved these payments. Rather, there must be sufficient evidence that the PEC would have considered the fact that these payments were going to Curtis and Price to be a "substantial and material factor" in determining whether the payments should be made. *See id.*

The PEC's assistant general manager testified that he approved several of the $30,000 payments to Clark Thomas that were each used to pay six months of Curtis's salary. The assistant manager stated that had he known that Clark Thomas was billing the PEC for Curtis's salary, he likely would have reported the matter first to Fuelberg, and then *potentially* to the PEC board of directors. Furthermore, the assistant general manager explained that if employees at the PEC had learned that Curtis was being paid as an outside consultant, "all hell would have broken loose" because employees might complain that Fuelberg was allowed to hire his relatives while other employees were not. This, according to the assistant manager, would have created a morale issue amongst PEC employees which would have become "an important consideration to management."

The three current and former PEC directors who testified at trial all stated that they would like to have known that Curtis and Price were being paid with PEC funds through Clark Thomas. According to these directors, although Fuelberg had the authority to hire outside consultants as he saw fit, given the general nepotism policy applicable to PEC employees, Fuelberg should have informed them of Curtis's and Price's status as outside consultants. One former director, Edwin Smith, stated that he was "pretty hot when he found out" that Fuelberg and Demond concealed Curtis's and Pirce's employment.

Although there was testimony that PEC employees would have reacted negatively to the revelation that Fuelberg authorized payments to Curtis and Price, there was no testimony that such morale issues would have prevented any PEC employee from authorizing these payments to Curtis and Price. Furthermore, although the PEC board members testified that they would like to have known that the PEC was indirectly paying Curtis's salary and Price's retainer, none of the directors testified that the board would have stepped in and blocked these payments. Similarly, none of the directors testified that had they known that Curtis and Price were being paid through Clark Thomas, they would have recommended that the PEC's nepotism policy be modified to cover outside consultants. Finally, no witness testified that had either the PEC's accounting department or board of directors known about these payments, they would have considered terminating Fuelberg's employment or reining in his authority.

**\*14** Thus, we conclude that the evidence is insufficient to support a finding that either Demond's or Fuelberg's deception induced the PEC to make payments it otherwise would not have made. Although it is understandable that the PEC board wished that Demond or Fuelberg had been more forthcoming, that frustration, standing alone, is not sufficient to prove beyond a reasonable doubt that their deceptive conduct induced the PEC to pay Clark Thomas for Curtis's and Price's salaries. Because the State indicted Demond for theft by deception, it was limited to that theory of theft, and was required to prove that some deceptive act induced the PEC's consent.

Having failed to offer such proof, we conclude that the evidence is insufficient to support Demond's conviction for theft by deception. We therefore reverse and vacate Demond's conviction for theft by deception. Having vacated Demond's conviction for theft, we need not address Demond's double-jeopardy complaint.

*Proceeds of criminal activity*

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- S.W.3d ----, 2014 WL 6612510 (Tex.App.-Austin)
**(Cite as: 2014 WL 6612510 (Tex.App.-Austin))**

[13]In his fifth appellate issue, Demond asserts that the "State's theory of money laundering is incorrect as a matter of law." Specifically, Demond argues that even if the evidence is sufficient to establish that he misapplied the PEC's funds, that misapplication was not complete until the money was transferred to Curtis and Price. Therefore, according to Demond, the PEC's funds did not become "proceeds of criminal activity" within the meaning of the Penal Code until after those funds had already been transferred through Clark Thomas, and thus Demond's alleged transfer of funds from Clark Thomas to Curtis and Price could not constitute the transfer of proceeds of criminal activity.

Relevant here, a person commits money laundering if he knowingly "(1) acquires or maintains an interest in, conceals, possesses, or transfers ... the proceeds of criminal activity or (2) conducts, supervises, or facilitates a transaction involving the proceeds of a criminal activity." Tex. Penal Code § 34.02(a)(1)-(2). "Criminal activity" is defined as any offense that is "classified as a felony under the laws of this state...." *Id.* § 34.01(1)(A). "Proceeds" are "funds acquired or derived directly or indirectly from, produced through, realized through, or used in the commission of ... an act." *Id.* § 34.01(4)(A). The predicate criminal activity alleged in the indictment is "misapplication of fiduciary property with an aggregate value of $100,000 or more." *See id.* § 34.02(e)(3) (classifying money laundering as second-degree felony if value of funds laundered more than $100,000 but less than $200,000). Therefore, the State was required to prove that Demond either (1) acquired or maintained an interest in, concealed, possessed, or transferred the proceeds of misapplication of fiduciary property or (2) conducted, supervised, or facilitated a transaction involving the proceeds of such a misapplication.

Demond contends, and the State appears to agree, that for purposes of the money-laundering statute, money does not become proceeds of criminal activity until the underlying criminal offense is complete. *See id.* § 34.01. The parties rely on federal cases interpreting the federal money-laundering statute for this assertion.[FN9] *See generally United States v. Harris,* 666 F.3d 905, 907–08 (5th Cir.2012) (discussing cases in which appellate courts held that relevant funds were not proceeds of criminal activity before they were transferred); *see also* 18 U.S.C. §§ 1956–57 (defining federal money-laundering offense). We note, however, that although the Texas money-laundering statute and its federal counterpart contain similar provisions, they are not identical. *Compare* 18 U.S.C. §§ 1956–57, *with* Tex. Penal Code §§ 34.01–.02. Relevant here, the Texas money-laundering statute defines "criminal activity" as "any offense, including *any preparatory offense,*" that is classified as a felony. Tex. Penal Code § 34.01(1) (emphasis added). Furthermore, the Texas statute defines "proceeds" as "funds acquired or derived directly *or indirectly* from, produced through, realized through, *or used in the commission of* " a criminal activity. *Id.* § 34.01(4) (emphasis added). Given that the Texas money-laundering statute broadly defines (1) criminal activity to include inchoate crimes and (2) proceeds of criminal activity to include indirect gains and money used to assist in the commission of the criminal activity—neither of which is present in the federal statute—it is by no means clear that a predicate offense must be complete before it can create proceeds of criminal activity. However, because the parties do not dispute this issue and we can resolve Demond's sufficiency complaint on other grounds, we will assume, without deciding, that the predicate misapplication of fiduciary property needed to be complete before Demond's alleged money laundering occurred.

> FN9. This Court and the court of criminal appeals have also looked to federal cases interpreting the federal money-laundering statute for guidance in applying Texas law. *See, e.g., DeLay v. State,* 443 S.W.3d 909, ——, 2014 WL 4843917, *8 n. 55 (Tex.Crim.App.2014); *DeLay v. State,* 410 S.W.3d 902, 914 (Tex.App.—Austin 2013), *aff'd,* 443 S.W.3d at ——, 2014 WL 4843917, at *12.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- S.W.3d ----, 2014 WL 6612510 (Tex.App.-Austin)
**(Cite as: 2014 WL 6612510 (Tex.App.-Austin))**

**\*15** [14][15]To prove misapplication of fiduciary property, the State was required to show that Fuelberg (1) "failed to apply the funds according the terms of the agreement" under which they were held and (2) the misapplication created a substantial risk of loss to the PEC. *See Merryman v. State,* 391 S.W.3d 261, 270 (Tex.App.—San Antonio 2012, pet. ref'd). "The actual disposition of the money is *immaterial,* and the State is not required to prove how the fiduciary applied the funds 'if the State has proved that the fiduciary failed to apply the funds according to the terms of the agreement.' " *Skillern v. State,* 355 S.W.3d 262, 268–69 (Tex.App.—Houston [1st Dist.] 2011, pet. ref'd) (emphasis added) (quoting *Little v. State,* 699 S.W.2d 316, 318 (Tex.App.—San Antonio 1985, no pet.)); *see also Merryman,* 391 S.W.3d at 270 (same). Therefore, the State was not required to prove that the PEC's funds ultimately were received by Curtis and Price to establish misapplication, and the jury could have reasonably concluded that the misapplication of fiduciary property was complete when Fuelberg transferred the funds from the PEC to Clark Thomas. *See Merryman,* 391 S.W.3d at 270; *Skillern,* 355 S.W.3d at 268–69. Similarly, the jury could have reasonably concluded that the PEC's funds became proceeds of criminal activity when they were received by Clark Thomas, that Demond's subsequent transfer of those funds to Curtis and Price was a transaction involving the proceeds of criminal activity, and therefore that Demond was guilty of money laundering. *See* Tex. Penal Code § 34.02(a)(2).

This analysis is consistent with federal cases dealing with similar federal statutes. In *United States v. Allen,* 76 F.3d 1348, 1352–53 (5th Cir.1996), a bank executive conspired to hire his business associates as consultants for the bank, pay the associates substantially more than their work would justify, and then have the associates "kickback" a portion of their consultant salaries to the executive. The executive and associates asserted that their misapplication of bank funds was not complete until the bank executive received his kickback and, therefore, none of the preceding transfers between the parties could constitute laundering of proceeds from that misapplication. *See id.* at 1360; *see also* 18 U.S.C. §§ 656 (misapplication of bank funds), 1956(a)(1)(B)(i) (money laundering).

The Fifth Circuit disagreed, concluding that the "[d]efendants' contentions fail because the funds at issue in each of the transactions became proceeds at the moment the money left the control of [the bank] and was deposited into the account of a consultant...." *Allen,* 76 F.3d at 1361 (internal citation omitted). The subsequent transfer from a consultant's account to another bank account constituted the transfer of proceeds of the misapplication, and thus money laundering. *Id.* To illustrate the point that the misapplication was complete as soon as the bank lost control of its funds, the court used the following hypothetical:

Suppose, for example, a consultant and a bank officer agree to an invoice and kickback scheme, but the consultant decides to cheat by keeping all the money and making no kickback. The two would have perpetrated a fraud against the bank. The bank officer in this example participated in the scheme by approving the invoice with intent to defraud. The dishonor among thieves is not relevant, certainly not to the bank.

*Id.*

Similarly here, Fuelberg committed misapplication of fiduciary property by authorizing payments to Clark Thomas to pay Curtis's salary and Price's retainer when he knew that the PEC was, at a minimum, overpaying for those services. Had Demond decided to cheat and not pay any of the PEC's money to Curtis and Price, either keeping it for himself or leaving it with Clark Thomas, the PEC's property still would have been misapplied, Fuelberg would still be guilty of misapplication of fiduciary property, and Demond would still be guilty as a party to Fuelberg's conduct.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

[16][17]Demond asserts that because the indictment alleges that he committed misapplication of fiduciary property "by making or causing payments to be made to" Curtis and Price, the State cannot now assert that the misapplication was complete when the PEC's property was transferred to Clark Thomas. Although Demond raises this issue as a sufficiency claim, the underlying argument may be more properly characterized as a material-variance issue similar to the party liability argument discussed above. *See generally Byrd,* 336 S.W.3d at 246 (discussing material variance). "[I]mmaterial variances are to be disregarded in the sufficiency of the evidence." *Id.* Therefore, if the allegation that the misapplication was committed by making payments to Curtis and Price is immaterial, then the State was not limited to that method of misapplication at trial, and the State could prove that the misapplication of fiduciary property was complete when the funds were transferred to Clark Thomas. *See id.*

**\*16** [18][19][20][21]There are three categories of variances: (1) "a variance involving statutory language that defines the offense," such as the theft-by-deception allegation discussed above; (2) "a variance involving a non-statutory allegation that describes an 'allowable unit of prosecution' element of an offense," such as misidentifying the name of a murder victim; and (3) "other types of variances involving immaterial non-statutory allegations." *See Johnson v. State,* 364 S.W.3d 292, 298–99 (Tex.Crim.App.), *cert. denied,* ––– U.S. ––––, 133 S.Ct. 536, 184 L.Ed.2d 351 (2012). The first category of variances is always material, and when an indictment alleges a specific statutory manner and means of committing an offense, then the State must prove that specific manner and means. *See, e.g., Geick,* 349 S.W.3d at 547–48 (concluding that if indictment alleges theft by deception, State is limited to that theory of theft). The second category involves non-statutory allegations that are "descriptive of an element of the offense that defines or helps define the allowable unit of prosecution," such as the name of the victim in an assault case or the property that was stolen in a theft case. *See Johnson,* 364 S.W.3d at 297. A variance in this second category can be material if it is "significant enough that we could not conclude whether the State had proved the same" offense alleged in the indictment. *Id.; see also Byrd,* 336 S.W.3d at 256–57 (noting that theft of property belonging to store manager would be completely separate offense than theft of property belonging to store, and thus misidentifying who owned the property was material variance). The final category involves unnecessarily specific descriptions of elements of the offense that do not affect the allowable unit of prosecution, such as alleging that the defendant committed assault by hitting the victim when in fact the defendant slammed the victim against a wall. *See Johnson,* 364 S.W.3d at 298 (noting that act that caused the injury does not define or help define whether offense is separate assault). Variances in this final category are always immaterial, and therefore do not affect the sufficiency of the evidence. *See id.* at 298–99.

The variance at issue in this case clearly does not fit into the first category because how a person commits misapplication of fiduciary property does not involve a statutorily defined manner and means of that offense. *Cf. Geick,* 349 S.W.3d at 547–48 (discussing how theft statute defines various ways that victim's consent can be ineffective). Similarly, the variance in this case is not descriptive of an element that defines or helps define the allowable unit of prosecution for misapplication of fiduciary property. *See Johnson,* 364 S.W.3d at 297. As discussed above, the actual disposition of fiduciary property is immaterial, "and the State is not required to prove how the fiduciary applied the funds." *Skillern,* 355 S.W.3d at 268–69. Rather, the State is required to show that the disposition of the property violated the fiduciary agreement under which it was held. *Id.* Thus, unlike the identity of the victim, the property allegedly misapplied, or the fiduciary agreement under which that property was held, the manner in which Demond misapplied the PEC's property is not descriptive of an element that helps define the allowable unit of prosecution for misapplication of fiduciary property, and therefore the variance at issue in this case does not fit within the second

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- S.W.3d ----, 2014 WL 6612510 (Tex.App.-Austin)
**(Cite as: 2014 WL 6612510 (Tex.App.-Austin))**

category of variances discussed above. *See Johnson,* 364 S.W.3d at 297 (noting that in theft prosecution, victim and property are two elements that affect unit of prosecution).

[22]Therefore, we conclude that the indictment's allegation that Demond misapplied property by causing payments to be made to Curtis and Price is in the third category of variances—i.e., types of variances involving immaterial non-statutory allegations. *See id.* Similar to the manner in which an assailant causes his victim's bodily injury, the manner in which Demond misapplied the PEC's property does not affect the allowable unit of prosecution for this offense, and thus a variance between the indictment and the evidence adduced at trial on this issue is immaterial. *See id.* Therefore, in considering the sufficiency of the evidence to prove when the misapplication of fiduciary property was complete, neither the State nor the jury was limited to the disposition of the PEC's property that was alleged in the indictment. [FN10] *See Byrd,* 336 S.W.3d at 246 (noting that immaterial variances do not affect sufficiency of evidence).

> FN10. Similarly, Demond's complaint that the jury charge did not assert that he committed misapplication of fiduciary property by making payments to Clark Thomas is without merit, as the State was not required to prove how Demond disposed of the PEC's property, but only that the property was applied in a manner that violated the fiduciary agreement under which it was held. *Skillern v. State,* 355 S.W.3d 262, 268–69 (Tex.App.—Houston [1st Dist.] 2011, pet. ref'd).

**\*17** For the reasons stated above, we conclude that the evidence is sufficient to prove that the misapplication of fiduciary property was complete when Fuelberg authorized PEC funds to be transferred to Clark Thomas. *See Merryman,* 391 S.W.3d at 270 (noting that actual disposition of fiduciary property is immaterial in proof of misapplication of fiduciary property); *Skillern,* 355 S.W.3d at 268–69 (same). Although our conclusion is based on Texas precedent, it is consistent with federal case law. *See Allen,* 76 F.3d at 1361. Thus, the PEC's funds became proceeds of criminal activity when they were transferred to Clark Thomas, and the jury could have reasonably concluded that Demond's subsequent transfer of those funds to Curtis and Price constituted money laundering because it was a transaction involving the proceeds of criminal activity. *See* Tex. Penal Code 34.02(a)(2). We overrule Demond's fifth issue on appeal.

**"Stacking" of jail time**

[23]In his sixth appellate issue, Demond asserts that the trial court erred in ordering him to submit to 500 days in jail as a condition of his community supervision.[FN11] Demond cites to article 42.12, section 12(a) of the Code of Criminal Procedure, which provides that if "a judge having jurisdiction of a felony case requires as a condition of community supervision that the defendant submit to a period of confinement in a county jail, the period of confinement may not exceed 180 days." Demond argues that this provision means that a trial court cannot order a defendant to submit to more than 180 days confinement for any case, regardless of how many felony convictions arise out of that case. Therefore, according to Demond, the trial court abused its discretion in ordering him to submit to separate terms of confinement for each of his felony convictions.

> FN11. The conditions of community supervision state that Demond must submit to 140 days confinement for misapplication, 180 for theft, and 180 for money laundering, with the confinements to be served consecutively.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- S.W.3d ----, 2014 WL 6612510 (Tex.App.-Austin)
**(Cite as: 2014 WL 6612510 (Tex.App.-Austin))**

The court of criminal appeals has specifically rejected this argument, concluding that article 42.12, section 12(a) authorizes terms of confinement of up to 180 days *per felony conviction. See Kesaria v. State,* 189 S.W.3d 279, 279 (Tex.Crim.App.2006). Demond does not assert that there has been any intervening change in the statute or case law, but instead claims that the court of criminal appeals failed to properly analyze the statute. Even if we were to agree with Demond on this issue, we are bound to conform our opinions to those of the court of criminal appeals. *See State v. DeLay,* 208 S.W.3d 603, 607 (Tex.App.—Austin 2006), *aff'd sub. nom., State v. Colyandro,* 233 S.W.3d 870 (Tex.Crim.App.2007). Therefore, we overrule Demond's sixth issue on appeal.

However, because we have vacated Demond's conviction for theft by deception, Demond is no longer on community supervision for that offense. *See Kesaria,* 189 S.W.3d at 279 (concluding that trial court may order 180–day confinement as condition of community supervision for each felony conviction). Therefore, we modify the trial court's order imposing conditions of community supervision to delete the requirement that Demond submit to 180 days confinement for theft by deception. *See supra* n.11. As modified, we affirm the trial court's conditions of community supervision.

**Disqualification and recusal of Judge Mills**

In his seventh appellate issue, Demond asserts that as a PEC customer, Judge Mills (1) had a disqualifying pecuniary interest in this case, (2) had a disqualifying personal interest in this case, and (3) should have been recused because his impartiality might reasonably be questioned. These identical appellate issues were raised and fully addressed in this Court's two prior opinions concerning Fuelberg's appeal. *See Fuelberg v. State,* 410 S.W.3d 498, 502–507 (Tex.App.—Austin 2013, no pet.) (concluding Judge Mills did not have disqualifying pecuniary interest in this case); *Fuelberg v. State,* ——S.W.3d ——, —— – ——, No. 03–11–00317–CR, 2014 WL 3558761, *3–8 (Tex.App.—Austin 2014, no pet. h.) (concluding Judge Mills not otherwise disqualified or required to be recused). We will not repeat that analysis here.

**\*18** In this appeal, Demond adopted Fuelberg's appellate brief with regard to Judge Mills's recusal and disqualification in its entirety. For the reasons stated in our previous opinions, we conclude that Judge Mills was not disqualified and the assigned judge did not abuse his discretion in concluding that Judge Mills should not be recused. Therefore, we overrule Demond's seventh issue on appeal.

**Removal of seated juror**

[24]In his eighth and final appellate issue, Demond asserts that the trial court abused its discretion by removing a juror as disabled when the juror complained of a bladder infection. Specifically, Demond asserts that the infection was only temporary and the juror stated that she might be able to return the following day. This temporary illness, according to Demond, is not the type of illness that would make a juror "disabled from sitting" for purposes of article 36.29 of the Code of Criminal Procedure. Therefore, according to Demond, the trial court abused its discretion in concluding that the juror was disabled.

[25][26][27]If a juror, "as determined by the judge, becomes disabled from sitting," the judge may remove the juror and allow the trial to proceed with fewer than twelve jurors. Tex.Code Crim. Proc. art. 36.29(a). "Disabled, as used [in article 36.29], means any condition that inhibits the juror from fully and fairly performing the functions of a juror." *Griffin v. State,* 486 S.W.2d 948, 951 (Tex.Crim.App.1972). Such a condition can include "physical illness,

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- S.W.3d ----, 2014 WL 6612510 (Tex.App.-Austin)
**(Cite as: 2014 WL 6612510 (Tex.App.-Austin))**

mental condition, or emotional state which hinders one's ability to perform one's duties as a juror." *Landrum v. State,* 788 S.W.2d 577, 579 (Tex.Crim.App.1990) (internal citations omitted); *see also Granados v. State,* 85 S.W.3d 217, 235 (Tex.Crim.App.2002) (noting that juror's bias against defendant can make juror disabled if bias prevents juror from following court's instruction). "The determination as to whether a juror is disabled is within the discretion of the trial court." *Brooks v. State,* 990 S.W.2d 278, 286 (Tex.Crim.App.1999). Therefore, we will only reverse the trial court's ruling if it is outside the zone of reasonable disagreement. *See id.*

Midway through the second day of trial, an empaneled juror notified the court that she was ill with what was "[p]robably some kind of bladder infection" that was causing her significant pain. The juror stated that she generally took "AZO" when this type of pain begins and that medication "is supposed to clear up a minor infection," meaning she could likely return to court the following day. However, the juror did not know if this was a minor infection and was not certain that she would be better the next day. Based on the juror's statements, the trial court found that the juror was "physically incapable of proceeding because of her pain" and, over Demond's objections, dismissed the juror as disabled.

Demond asserts that because the juror believed she could return to court the following day, the trial would likely only have been delayed for half of a day. This type of temporary illness, according to Demond, does not constitute the type of illness that would justify finding a juror disabled. This Court, however, along with several of our sister courts of appeals, has rejected the argument that a temporary illness does not constitute a disability. *See Moore v. State,* 82 S.W.3d 399, 406–07 (Tex.App.—Austin 2002, pet. ref'd) (concluding trial court did not abuse discretion by dismissing juror with temporary gastrointestinal issues), *overruled on other grounds by Taylor v. State,* 268 S.W.3d 571, 588 (Tex.Crim.App.2008); *see also Romero v. State,* 396 S.W.3d 136, 143–44 (Tex.App.—Houston [14th Dist.] 2013, pet. ref'd) (citing several appellate court decisions rejecting argument that temporary illness does not constitute disability). In *Moore,* we concluded that a trial court did not abuse its discretion in finding a juror was disabled based on the juror's "severe gastrointestinal ailment" because "although a stomach ailment is only temporary, it remains within the trial court's discretion to determine whether this juror" could no longer perform his functions. 82 S.W.3d at 407.

**\*19** Demond does not cite to any cases in which an appellate court has concluded that a trial court abused its discretion by finding a juror to be disabled based on a temporary illness. Therefore, we adhere to our ruling in *Moore* and conclude that it is within the trial court's discretion to determine whether a temporary illness disables a juror. *See id.* Given that the juror in this case stated that her bladder infection caused her so much pain that she could not focus on the trial and that the juror was not certain that she would be able to return to court the next day, the trial court could have reasonably concluded that the juror's illness prevented her from performing her function as a juror. Therefore, we cannot conclude that the trial court abused its discretion in finding that the juror was disabled. We overrule Demond's eighth issue on appeal.

### CONCLUSION

Having concluded that the evidence is insufficient to support Demond's conviction for theft by deception, we reverse and vacate the trial court's judgment of conviction for that offense. Similarly, we modify Demond's conditions of community supervision to delete the requirement that he submit to 180 days' confinement for theft by deception. Having overruled Demond's remaining appellate issues, we affirm the trial court's judgments of conviction in all other respects.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- S.W.3d ----, 2014 WL 6612510 (Tex.App.-Austin)
**(Cite as: 2014 WL 6612510 (Tex.App.-Austin))**


Tex.App.-Austin, 2014
Demond v. State
--- S.W.3d ----, 2014 WL 6612510 (Tex.App.-Austin)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.